**HARAD, Charles A. and the Home Insurance Company,**

v.

**The AETNA CASUALTY AND SURETY COMPANY, Appellant.**

**and**

**Catania, Francis J.**

No. 87–1373.

United States Court of Appeals, Third Circuit.

Argued Dec. 14, 1987.

Decided Feb. 23, 1988.

Rehearing and Rehearing En Banc Denied March 28, 1988.

---

Fredric L. Goldfein (argued), Elissa J. Kahn, Goldfein & Joseph, Philadelphia, Pa., for appellant.

H. Robert Fiebach (argued), Neil S. Witkes, Wolf, Block, Schorr and Solis-Cohen, Philadelphia, Pa., for appellees.

Before SLOVITER, COWEN, Circuit Judges, and DEBEVOISE, District Judge *.

## OPINION OF THE COURT

COWEN, Circuit Judge.

This appeal arises from an order of the district court which held that, under the terms of an insurance contract issued by Aetna, Aetna had a duty to defend and indemnify its insured. The district court determined that Aetna had not established a meritorious defense and refused to vacate a default judgment which had been entered against Aetna. Since we conclude that the lower court misinterpreted the terms of the contract of insurance, and that an exclusion contained in the policy relieved Aetna of the duty to defend or indemnify its insured, we will reverse.

### I.

The material facts of this case are not in dispute. Plaintiff, Charles Harad, is an attorney licensed to practice in the Commonwealth of Pennsylvania who maintains an office in Philadelphia, Pennsylvania. To cover potential liability arising from that practice, Harad secured two policies of insurance, one from The Aetna Casualty and Surety Company ("Aetna"), the other from The Home Insurance Company ("Home").[1]

In July 1986, nominal defendant Catania filed a lawsuit against Harad and The Hanover Insurance Company ("Hanover"), claiming malicious prosecution, pursuant to 42 Pa.Cons.Stat.Ann. § 8351 *et seq.*, arising out of Harad's representation of Hanover in an action filed by Catania against Hanover. Catania's lawsuit was based on Harad's signing a verification to an answer and counterclaim, in which Hanover asserted that Catania "conspired and/or contrived to

---

* The Honorable Dickinson R. Debevoise, United States District Judge for the District of New Jersey, sitting by designation.

1. Home's policy of insurance was a professional liability insurance policy (lawyers), whereas Aetna's policy was entitled "Business Owners Policy (Deluxe)."

defraud Hanover by concealing and/or misrepresenting the fact that the vehicles" insured by Hanover were for personal rather than business use. App. at 18.

Since Harad was insured under two policies of insurance, Home and Aetna (through its Philadelphia office) discussed their duty to defend Harad. They could not come to an agreement. Aetna, relying on the professional liability exclusion in its policy, refused to defend Harad. However, Home undertook Harad's defense. On December 12, 1986, Home and Harad filed a complaint against Aetna seeking, *inter alia*, a declaratory judgment that Aetna was under a duty to defend and indemnify Harad. An amended complaint was filed by Home and Harad on December 23, 1986, adding Francis J. Catania as a nominal defendant, since he may have an interest in this litigation.

The amended complaint was served by certified mail on defendant Aetna at its Hartford, Connecticut, office on December 23, 1986. Plaintiffs Home and Harad did not serve a copy on Aetna's Philadelphia office, with which they had negotiated previously. Shortly thereafter, Aetna forwarded the matter to its Philadelphia office, and an attorney representing Aetna entered his appearance in the district court on January 9, 1987. On that same date plaintiffs filed a Request to Clerk for Entry of Default and a Default Judgment. The request for default was entered on the docket on January 12, and the entry of appearance was docketed on January 14. In addition, on January 14 the district court granted plaintiffs' request for default judgment, and entered judgment against Aetna in the amount of $16,737.16. The Court also ordered Aetna to defend and indemnify Harad in the lawsuit filed by Catania.

Aetna moved to vacate the default judgment on January 16, 1987, and to that end the parties entered into a stipulation, approved by the district court on February 2, 1987. The stipulation limited the issues to be addressed on the motion to "whether or not Aetna has established a meritorious defense which would constitute a defense to plaintiff's [sic] action." App. at 195. The district court considered this motion and, by Memorandum and Order dated June 9, 1987, declined to vacate the default judgment.

Although the district court recognized that the issue was whether Aetna had "established" a meritorious defense,[2] the court felt that the policy exclusion at issue—i.e., coverage for liability "arising out of the rendering or failure to render any professional service"—did not apply under the facts of this case. The district court expressed its view that a malicious prosecution claim was not excluded under the policy because Harad had not rendered or failed to render professional services to the party suing him. The court also found the exclusion ambiguous in light of the overall policy provisions establishing coverage, and construed the ambiguity against the drafter. The district court therefore denied Aetna's motion to vacate the default, concluding that it had not set forth a valid defense on the merits pursuant to the stipulation. Aetna appeals to this Court.

## II.

Aetna argues that the district court erred in failing to set aside the default judgment, and in finding that the exclusion in Aetna's policy did not relieve Aetna of the obligation to defend and indemnify Harad. We review the lower court's refusal to set aside the default judgment under an abuse of discretion standard. *Farzetta v. Turner & Newall, Ltd.*, 797 F.2d 151, 153 (3d Cir.1986); 10 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure*

---

2. Notwithstanding the fact that the parties stipulated that the default should be vacated if Aetna established a meritorious defense to the action, the trial court noted that "establishing" a defense is not the same as alleging one, and that the word choice was "not entirely appropriate." App. at 244. At argument Aetna conceded that use of the word "establish" was a poor choice of words and what was really meant was that Aetna had to allege a prima facie defense. We need not address the intent of the parties in using the word "establish" because we hold in this opinion that the district court was legally required to examine the substantive merits of Aetna's defense. *See* Section III.A. *infra.*

§ 2693, at 472–74 (1983). Our review of the interpretation of the insurance contract and the applicability of the policy exclusion, however, is plenary. *Pacific Indem. Co. v. Linn*, 766 F.2d 754, 760 (3d Cir.1985).

Although this Court has adopted a policy disfavoring default judgments and encouraging decisions on the merits, *Tozer v. Charles A. Krause Milling Co.*, 189 F.2d 242, 245 (3d Cir.1951), the decision to vacate a default judgment is left to the sound discretion of the trial court. In exercising this discretion, however, the court must consider whether vacating the default judgment will visit prejudice on the plaintiff, whether the defendant has a meritorious defense, and whether the default was the result of the defendant's culpable conduct. *United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 195 (3d Cir.1984).

### III.

#### A.

Aetna first argues that in assessing whether or not it had a meritorious defense, the district court erred by considering the substantive sufficiency of the defense rather than its facial validity. Aetna avers that both under the terms of the stipulation and the law in this Circuit, all it was required to do is raise the defense. We disagree.

In *$55,518.05 in U.S. Currency* we noted that a defendant does not have the right to have a default judgment set aside automatically upon alleging a defense. Rather, we imposed a more stringent standard which requires that a defendant seeking to set aside a default judgment set forth with some specificity the grounds for his defense. The court must then evaluate that defense to determine whether it is meritorious. In *$55,518.05 in U.S. Currency*, we looked to the nature of the action and to the facts a defendant would have to allege in an answer in order to defend his property from a forfeiture, pursuant to the Drug

Abuse Prevention and Control Act, 21 U.S. C. § 881 (1982). After applying this standard in a substantive examination of the defendant's allegations, we determined that the defendant had not met this burden when he asserted, in a conclusory manner, that the money in question was not used or intended for use in a drug transaction.

Similarly when Aetna alleged the applicability of the professional liability exemption, the district court assessed the merits of the defense in order to determine whether, under the facts of the case and the overall language of the policy, the exemption could be considered a meritorious defense. Unfortunately from Aetna's perspective, the court determined that the exemption did not apply under the facts before it. We cannot conclude, however, that the court erred in examining the substance of Aetna's defense. It could do no less. The district court would have applied an incorrect legal standard if it had merely facially scrutinized Aetna's defense.[3]

#### B.

Aetna further asserts that the exclusion provides a complete defense to plaintiffs' claims. In opposition, Harad and Home argue that the policy clearly provides coverage for a malicious prosecution claim, such as the one asserted by Catania in his lawsuit against Harad and Home. As there are no material facts in dispute and the interpretation of a contract of insurance is a question of law, *Standard Venetian Blind Co. v. American Empire Ins. Co.*, 503 Pa. 300, 305, 469 A.2d 563, 566 (1983), we may interpret the coverage of the policy. *Niagara Fire Ins. Co. v. Pepicelli*, 821 F.2d 216, 219 (3d Cir.1987). We therefore turn to an assessment on the merits of whether the exclusion provides a complete defense.

The policy terms which plaintiffs aver cover Harad's liability in this case state, in relevant part:[4]

---

**3.** Aetna also contends that the district court erred in precluding discovery. Aetna conceded at oral argument, however, that further dis-

covery would yield no material information. Therefore, we need not address this argument.

**4.** Despite the district court's determination that the policy terms were ambiguous, the parties

## III. PERSONAL INJURY AND ADVERTISING OFFENSE LIABILITY COVERAGE:

The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of *personal injury* or advertising offense sustained by any person or organization and *arising out of the conduct of the insured's business*, if the offense is committed during the policy period within the policy territory, and the Company shall have the right and duty to defend any suit against the insured seeking damages on account of such injury, even if any of the allegations of the suit are groundless, false or fraudulent....

App. at 43 (emphasis added). The policy thereafter defines the term "personal injury" as follows:

### D. Additional Definitions:

With respect to the Personal Injury and Advertising Offense Liability Coverage, the following additional definitions apply:

.        .        .        .

"personal injury" means injury arising out of the offense of false arrest, detention, imprisonment, *malicious prosecution*, the publication or utterance of a libel or slander or other defamatory or disparaging material, or the publication or utterance in violation of an individual's right of privacy....

App. at 44 (emphasis added).

Plaintiffs' position is that since the policy covers personal injuries, including specifically malicious prosecution, arising out of the conduct of the insured's business, and in this case the alleged malicious prosecu-

tion arose out of Harad's business, Aetna by the terms of its contract with the insured was under a duty to defend and indemnify him.

Aetna acknowledges that the aforementioned language would, at least facially, compel it to defend and indemnify Harad, but for the professional services exclusion, which reads:

### H. PROFESSIONAL LIABILITY EXCLUSION:

This insurance does not apply:

1. When this policy is issued to a Medical Doctor, Dentist, Osteopath, Veterinarian, Nurse, Psychologist, Chiropractor, Funeral Director, X–Ray Technician, Appraiser, Optometrist, Optician, *Attorney* or accountant or to a business so engaged to bodily injury, medical payments, property damage or *personal injury arising out of the rendering or failure to render any professional service*....

App. at 48 (emphasis added). The sole issue, then, is whether the exclusion applies under these facts.

In this case, Harad was sued specifically because he had signed a verified complaint on behalf of his client, Hanover. The district court felt that this action on the part of Harad should not be considered a "rendering or failure to render [a] professional service." App. at 245. Determinative for the court below was the fact that "Mr. Harad neither rendered nor failed to render any professional service to the [party] who is now suing him." App. at 246. Thus, the district court was unwilling to accept that "professional liability" can ever arise out of an attorney's activities with anyone other than his own client.[5]

conceded at oral argument that the terms of the exclusion are not ambiguous, and that this Court may interpret the policy provisions without the need for extrinsic evidence. We agree that the terms of the policy are not ambiguous. Were we to accept the reasoning of the district court, any exclusion, when read in conjunction with the general provisions of a policy, could be considered ambiguous and contradictory.

**5.** As a legal proposition this is incorrect. Although attorneys are generally not liable to third parties for the consequences of their ac-

tions because of privity requirements, the law recognizes several limited situations in which an attorney can be held liable to non-client third parties. *See generally,* Annotation, *Attorney's Liability, to One Other Than His Immediate Client, for Consequences of Negligence in Carrying Out Legal Duties,* 45 A.L.R.3d 1181 (1972 and West Supp.1986). For example, an attorney can be held accountable to intended legatees for malpractice where the attorney's misfeasance results in a loss of the bequest, *see, e.g., Needham v. Hamilton,* 459 A.2d 1060 (D.C.App.1983); *Lucas v. Hamm,* 56 Cal.2d 583, 15 Cal.Rptr. 821,

We fail to see why such a limitation on the term "professional service" should be read into the policy for several reasons. First, the policy itself is silent as to the meaning of this term. Second, turning to the plain and ordinary meaning of the term, we have not found nor has there been brought to our attention anything to suggest that the term embodies a privity requirement. Third, the very statute under which Catania sued Harad clearly contemplated that attorneys would be held liable to third parties for their participatory activity on behalf of their clients. *See* 42 Pa. Cons.Stat.Ann. § 8352(3) (Purdon 1982) ("good faith" exception for attorneys who participate in lawsuits).

Moreover, the district court's characterization of Harad's conduct does not comport with our analysis using the definition of "professional services" articulated and applied by several courts, which have recognized it to mean:

> Something more than an act flowing from mere employment or vocation ... [t]he act or service must be such as exacts the use or application of special learning or attainments of some kind. The term "professional" ... means something more than mere proficiency in the performance of a task and implies intellectual skill as contrasted with that used in an occupation for production or sale of commodities. A "professional" act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual. In determining whether a particular act is of a professional nature or a "professional service" we must look not to the title or character of the party performing the act, but to the act itself.

*Marx v. Hartford Accident and Indemnity Co.*, 183 Neb. 12, 13–14, 157 N.W.2d 870, 871–72 (1968) (citations omitted) (quoted in *Bank of California, N.A. v. Opie*, 663 F.2d 977, 981 (9th Cir.1981)); *Curtis Ambulance v. Board of Cty. Comm'rs*, 811 F.2d 1371, 1379–80 (10th Cir.1987); *Horn v. Burns & Roe*, 536 F.2d 251, 255 (8th Cir. 1976); *St. Paul Fire & Marine Ins. Co. v. Three "D" Sales, Inc.*, 518 F.Supp. 305, 310 (D.N.D.1981); *Noyes Supervision, Inc. v. Canadian Indem. Co.*, 487 F.Supp. 433, 438 (D.Colo.1980); *see also* 7A Appleman, *Insurance Law and Practice* § 4504.01, at 309–11 (1979).

In examining the character of the conduct alleged to be actionable in this case, it appears to us that the nature of the services rendered by Harad was purely professional. Harad drafted, signed and filed on behalf of Hanover an answer and counterclaim, which conduct in turn exposed him to liability under 42 Pa.Cons.Stat.Ann. § 8351 *et seq.*[6] Clearly, these acts are professional in nature and go to the heart of

---

364 P.2d 685 (1961), *cert. denied*, 368 U.S. 987, 82 S.Ct. 603, 7 L.Ed.2d 525 (1962); *McAbee v. Edwards*, 340 So.2d 1167 (Fla.App.1976); *Woodfork v. Sanders*, 248 So.2d 419 (La.App.), *writ denied*, 259 La. 759, 252 So.2d 455 (1971), for prejudice caused by the late filing or dilatory prosecution of a claim, *see, e.g., Jenkins v. Wheeler*, 69 N.C.App. 140, 316 S.E.2d 354, *review denied*, 311 N.C. 758, 321 S.E.2d 136 (1984); *Donald v. Garry*, 19 Cal.App.3d 769, 97 Cal.Rptr. 191 (1971), for errors in the examination and certification of title to real property, *see, e.g., United Leasing Corp. v. Miller*, 45 N.C. App. 400, 263 S.E.2d 313, *petition denied*, 300 N.C. 374, 267 S.E.2d 685 (1980), or generally in situations where the attorney in acting knows that a non-client is relying on his services, *see Page v. Frazier*, 388 Mass. 55, 445 N.E.2d 148 (1983); *Albright v. Burns*, 206 N.J.Super. 625, 503 A.2d 386 (App.Div.1986), or where a third party is an intended beneficiary of an attorney's services, relies on those services, and is injured by the attorney's negligence, *see Roberts v. Ball, Hunt, Hart, Brown & Baerwitz*, 57 Cal.App.3d 104, 128 Cal.Rptr. 901 (1976).

**6.** This section states, in relevant part:

(a) **Elements of action.**—A person who takes part in the procurement, initiation or continuation of civil proceedings against another is subject to liability to the other for wrongful use of civil proceedings [sic]:

(1) He acts in a grossly negligent manner or without probable cause and primarily for a purpose other than that of securing the proper discovery, joinder of parties or adjudication of the claim in which the proceedings are based; and

(2) The proceedings have been terminated in favor of the person against whom they are brought.

42 Pa.Cons.Stat.Ann. § 8351(a) (Purdon 1982).

the type of services an attorney provides to his clients. Indeed, Harad would not have been legally able to sign the answer and counterclaim (and thereby expose himself to liability) had he not been a licensed attorney acting on behalf of his client. Since Harad's liability in this case flowed directly from his performance of a professional activity, and as the policy excluded coverage for any liability arising from the "rendering ... of any professional service," the exclusion clearly obviates any duty to defend and indemnify.

Our interpretation of the applicability of the exclusion is consistent with the policy when examined as a whole, which we must also consider. *C. H. Heist Caribe Corp. v. American Home Assurance Co.*, 640 F.2d 479, 481 (3d Cir.1981). Aetna's policy was entitled "Business Owners Policy (Deluxe)," which implies that the policy was intended to cover liability arising from the operation of a business. The terms of the policy purport to cover such business liability, but not professional liability. Harad and Home argue that Harad's business is the practice of law. However, the practice of law, as other similarly regulated professional activity in today's world, has two very different and often overlooked components—the professional and the commercial. The professional aspect of a law practice obviously involves the rendering of legal advice to and advocacy on behalf of clients for which the attorney is held to a certain minimum professional and ethical standards. The commercial aspect involves the setting up and running of a business, i.e., securing office space, hiring staff, paying bills and collecting on accounts receivable, etc., in which capacity the attorney acting as businessperson is held to the same reasonable person standard as any other. Indeed, the professional services and the business distinction drawn by the two policies and Harad's recognition of the limitations inherent in each is manifested by the fact that Harad purchased a separate professional liability policy from Home.

Given the dual nature of the practice of law, an attorney's liability for an action should be assessed depending on the particular role he was performing at the time the alleged liability arose. For example, if an attorney, while hosting a real estate closing in his office, places his briefcase on the floor and a colleague trips on it, is injured and sues him, the lawyer's liability would derive not from the rendering of a professional service, but rather from his operation of a business. Conversely, since Harad's conduct in this case was not related to his operation of a business, but was derived solely from his providing legal services to a client, his liability is professional in nature.

## IV.

We are of the opinion that Harad's conduct in this case falls squarely within the meaning of the phrase "rendering ... [a] professional service" as set forth in the professional liability exclusion of the policy, and that the exclusion applies and provides a complete defense to plaintiffs' action. We therefore will reverse the default judgment and remand. The district court will enter judgment in favor of Aetna. Each party to bear its own costs.

SLOVITER, Circuit Judge, dissenting.

I agree with the majority that in the circumstances of this case, where the parties had stipulated that "[t]he only issue to be determined by the Court in connection with the motion to set aside default judgment is whether or not Aetna has established a meritorious defense which would constitute a defense to plaintiffs' action," App. at 195, the district court did not err in deciding the merits of Aetna's position rather than merely whether a meritorious defense was alleged. I differ with the majority, however, in their conclusion that Aetna's policy excluded Harad's claim against it. Although the majority's construction of the policy language is not an unreasonable one, it is not the only possible construction. *See Little v. MGIC Indemnity Corp.*, 836 F.2d 789, 794–95 (3d Cir. 1987). Therefore, I agree with Chief Judge Fullam who decided this case in the district court that, at best, the Aetna policy was ambiguous, containing two contradictory

provisions. Under Pennsylvania law, ambiguity in an insurance contract is to be resolved against the insurer.[1] Therefore, the judgment against Aetna, which was the insurer in this case, should be affirmed.

The Aetna policy is a Business Owners Policy, sets forth that Harad's business is that of an Attorney at Law, and provides, *inter alia,* coverage for damages arising out of claims for personal injury. The definition of personal injury applicable to the "Personal Injury And Advertising Offense Liability Coverage" expressly *includes* malicious prosecution: "[p]ersonal injury means injury arising out of the offense of ... malicious prosecution." App. at 91. The majority concludes that notwithstanding this embrasive inclusion, Aetna need not defend the malicious prosecution suit brought by Catania against Harad because the policy excludes "personal injury arising out of the rendering or failure to render any professional service" if the policy is issued to an attorney, or certain other named professionals. App. at 95.

The district court held that this exclusion for rendering or failing to render professional services had no application to Harad's potential liability to Catania, who was an adverse party to Harad's client and to whom he rendered no professional services. In concluding that the district court erred, the majority refers to cases in other jurisdictions construing the term "professional services."[2] *See* Maj. at 984. However, in almost all of the relevant cases, the term has been construed to extend liability coverage for the insured, and not to contract it. *See, e.g., Bank of California, N.A. v. Opie,* 663 F.2d 977 (9th Cir.1981); *St. Paul Fire & Marine Ins. Co. v. Three "D" Sales, Inc.,* 518 F.Supp. 305, 310 (D.N.D.1981); *Noyes Supervision, Inc. v. Canadian Indem. Co.,* 487 F.Supp. 433, 438 (D.Colo.1980). It is particularly significant that the Pennsylvania courts, to whom we must look for the construction of Pennsylvania law, have viewed the term "professional services" to be ambiguous, *see Danyo v. Argonaut Insurance Companies,* 318 Pa.Super. 28, 464 A.2d 501, 502 (1983), and have upheld coverage based on the ambiguity in the policy.

Aetna's policy does not define the term "professional services" as used in the exclusion or elsewhere. This court faced a similar situation in *Pacific Indemnity Co. v. Linn,* 766 F.2d 754, 763 (3d Cir.1985), where we held that when the term "professional services" is not defined within the policy and is subject to more than one reasonable interpretation, the term is ambiguous. A term is ambiguous under the law "if reasonably intelligent men on considering it in the context of the entire policy would honestly differ as to its meaning." *Celley v. Mutual Benefit Health and Accident Association,* 229 Pa.Super. 475, 324 A.2d 430, 434 (1974).

In *Linn,* we referred to the well settled principle under Pennsylvania law that "where ambiguous, exceptions to an insurer's general liability are to be strictly construed against the insurer." 766 F.2d at 763. Accordingly, we held that the exclusion from coverage for injuries resulting from the rendering or failure to render professional services was inapplicable to exclude coverage for claims based on the insured physician's alleged liability arising out of a diet book he authored. We stated in *Linn* that "[a]lthough Aetna's reading of the exclusion is plausible, *i.e.,* professional services are not covered, under Pennsylvania law the ambiguity must be resolved in favor of the insured." *Id.* I see no reason why the same result should not follow in this case.

There is yet another reason why Aetna's claim that this coverage is excluded should fail. Aetna knew when it provided business insurance for Harad that his business was that of an attorney. Insurance compa-

---

1. This court has held, following Pennsylvania's law, that the rule of construction in favor of the insured is not altered by the fact that the insurer and insured are both large corporations that bargained together over the policy. *See ACandS, Inc. v. Aetna Casualty and Surety Co.,* 764 F.2d 968, 973 (3d Cir.1985).

2. The cases relied on by the majority in footnote 5 do uphold actions against attorneys by third parties, but do not consider construction of insurance policies and in particular do not hinge on the definition of "professional services."

nies should not be allowed to give coverage with the right hand and then take it away with the left. I cannot agree with the niggardly approach taken by Aetna, and accepted by the majority, that the Business Owners Policy is intended to cover only the "non-professional" business activities of an attorney, such as renting office space, purchasing supplies, and hiring and firing staff. Such an approach is particularly inappropriate here because the Aetna policy expressly includes coverage for malicious prosecution, which is different in essence from the ministerial activities to which Aetna claims it is limited. It is difficult to conceive of the type of malicious prosecution suit brought against an attorney to which the express coverage would apply under Aetna's construction. If it wanted to exclude the defense of attorneys in malicious prosecution suits, it should have done so expressly.

Therefore, I would affirm the judgment of the district court.