CONTINENTAL CASUALTY CO. and
L. Robert Kimball & Associates

v.

HARTFORD ACCIDENT & INDEMNITY
CO. and ITT Hartford Group, Inc.

Civ. A. No. 92–5325.

United States District Court,
E.D. Pennsylvania.

June 24, 1993.

Michelle T. Wirtner, John F. Ledwith, La Brum and Doak, and Elliott R. Feldman, Cozen & O'Connor, Philadelphia, PA, for plaintiffs.

Allan D. Windt, Philadelphia, PA, for defendants.

### MEMORANDUM

GILES, District Judge.

Defendant Hartford Accident and Indemnity Company ("Hartford") has moved for

summary judgment as to all claims asserted against it by plaintiff Continental Casualty Company ("CNA"). For the reasons stated below, the motion is denied.

## I. BACKGROUND AND PROCEDURAL HISTORY

In April of 1985, L. Robert Kimball and Associates ("Kimball") entered into an Engineering Agreement with the Commonwealth of Pennsylvania, Department of Transportation ("PennDOT") to provide certain inspection services for the Schuylkill Expressway construction project. Soon after the project began, one worker was killed and another injured on the job site when a crane came into contact with an overhead power line.

As a result of this accident, lawsuits were brought in the Philadelphia County Court of Common Pleas against Kimball, PennDOT, and numerous other parties who allegedly played some role in the accident. Kimball eventually settled the cases for nearly one million dollars. Kimball was insured by both CNA and Hartford, and each insurer paid half of the defense costs throughout the litigation. However, Hartford refused to pay any of the settlement. CNA paid the bulk of the settlement, and now seeks indemnification from Hartford.[1] Hartford argues that the reason it did not contribute to the settlement of the underlying lawsuits, and the reason that it should not be required to indemnify CNA, is that the loss in the underlying lawsuits was not covered by its policy.

The CNA and Hartford policies insured Kimball against different types of losses. Kimball had a "professional liability" policy with CNA and a "comprehensive business" policy with Hartford. The CNA professional liability policy protected Kimball from personal injury claims arising out of its performance or failure to perform professional services. *See* Hartford Exhibit G. The Hartford comprehensive business policy covered all personal injury claims against Kimball. However, the Hartford policy carries the following endorsement excluding coverage for losses arising from professional services:

> It is agreed that the insurance does not apply to *bodily injury or property damage* arising out of the rendering of or the failure to render any professional services by or for the *named insured*, including:
>
> 1. the preparation or approval of maps, plans, opinions, reports, surveys, designs or specifications and
>
> 2. supervisory, inspection or engineering services.

Hartford Exhibit D (emphasis in original).

■ If the source of potential liability in the underlying lawsuits was Kimball's failure to render appropriate professional services, CNA's policy covers the loss, Hartford's policy excludes coverage, and Hartford need not indemnify CNA. However, if potential liability arose from Kimball's breach of a duty to perform general, non-professional services, Hartford must indemnify CNA unless some other part of its policy with Kimball excludes coverage for the loss. *See Cooper Laboratories v. International Surplus Lines,* 802 F.2d 667, 673–74 (3d Cir.1986) (when underlying lawsuit settles without finding of liability, and dispute over insurance coverage arises thereafter, court must use available evidence to determine basis for liability).

Hartford has moved for summary judgment against CNA's indemnification claim. Hartford argues that the material facts are undisputed and require the court to find as a matter of law that the losses in the underlying lawsuits arose from Kimball's breach of a duty to render appropriate professional services. Because Hartford's policy excluded professional services from its coverage, Hartford contends that summary judgment must be entered in its favor. The court agrees that there are no genuine issues of material fact. However, the undisputed facts do not command judgment as a matter of law in Hartford's favor. Therefore, Hartford's motion must be denied. *See* Fed.R.Civ.P. 56.

1. Because Kimball's policy with CNA had a $250,000 self-insured retention, some of the settlement had to be paid by Kimball. As a result, Kimball is also a plaintiff in the instant case, claiming that Hartford owes it the money it paid in contribution to the settlement, as well as certain defense costs that were not paid by Hartford or CNA. This opinion does not deal with Kimball's claims, but deals solely with Hartford's duty to indemnify CNA.

## II. APPLICABLE LEGAL STANDARDS

Federal Rule of Civil Procedure 56 requires that summary judgment be entered in favor of the moving party when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

■ When the underlying facts are not in dispute, the interpretation of an insurance contract is a question of law. *Harad v. Aetna Cas. & Sur. Co.*, 839 F.2d 979, 982 (3d Cir.1988) (citing *Standard Venetian Blind Co. v. American Empire Ins. Co.*, 503 Pa. 300, 305, 469 A.2d 563, 566 (1983); *Niagra Fire Ins. Co. v. Pepicelli*, 821 F.2d 216, 219 (3d Cir.1987)). In interpreting a policy, the court is to "ascertain the intent of the parties as manifested by the language of the written instrument." *Gene & Harvey Builders, Inc. v. Pennsylvania Mfrs. Ass'n Ins. Co.*, 512 Pa. 420, 517 A.2d 910, 913 (1986).

> [I]f the language of an insurance policy is clear and unambiguous, its ordinary meaning is to be given effect; policy terms should be read to avoid ambiguities; a provision is ambiguous if reasonable persons on considering it in the context of the entire policy could honestly differ as to its meaning; if ambiguities do exist in the wording chosen by the insurance company, they must be resolved in favor of the insured; a court cannot rewrite the terms of a policy or give them a construction in conflict with the accepted and plain meaning of the language of the policy.

*Imperial Casualty & Indem. Co. v. High Concrete Structures, Inc.*, 858 F.2d 128, 131 (3d Cir.1988) (footnote omitted).

The rules of interpretation for non-insurance contracts are similar. "Under Pennsylvania law, a court interpreting a contract must first determine as a matter of law whether the contract language is ambiguous or clear.... If the language is ambiguous, the court must then leave interpretation of the contract to the jury; if the language is clear, the court must interpret the agreement." *Polish American Machinery Corp.*

*v. R.D. & D. Corp.*, 760 F.2d 507, 512 (3d Cir.1985) (citations omitted).

## III. DISCUSSION

It is undisputed that Kimball settled the underlying lawsuits out of fear that a particular term in its contract with PennDOT could subject it to liability at trial. *See, e.g.*, Hartford Ex. B (plaintiffs' pretrial memoranda in the underlying cases); Hartford Ex. B (deposition testimony of Kimball's general counsel, George William Myers, Jr.); Hartford Reply Ex. A (same); Hartford Reply Ex. C (letter from Kimball's attorney in the underlying action to Kimball, CNA and Hartford, reporting on settlement conference). The contract "construction safety" clause which was the source of potential liability in the underlying cases provides:

> B. Construction Safety
>
> The engineer [Kimball] shall assist the department [PennDOT] in obtaining compliance with the safety and accident provisions of the contract particularly Section VIII of the Required Contract Provisions.

"Section VIII" refers to the section of the Required Contract Provisions for "Federal–8" construction contracts for the United States Department of Transportation, Federal Highway Administration, which provides:

> In the performance of this contract, the contractor shall comply with all applicable Federal, State and local laws governing safety, health and sanitation. The contractor shall provide all safeguards, safety devices and protective equipment and take any other needed actions, on his own responsibility, or as the State highway department contracting officer may determine, reasonably necessary to protect the life and health of employees on the job and the safety of the public and to protect property in connection with the performance of the work covered by the contract.
>
> It is a condition of this contract, and shall be made a condition of each subcontract entered into pursuant to this contract, that the contractor and any subcontractor shall not require any laborer or mechanic employed in performance of the contract to work in surrounds or under working conditions which are unsanitary,

hazardous, or dangerous to his health or safety, as determined under construction safety and health standards (Title 29, Code of Federal Regulations, Part 1926, formerly Part 1518, as revised from time to time), promulgated by the United States Secretary of Labor, in accordance with Section 107 of the Contract Work Hours and Safety Standards Act (83 Stat. 96).

Hartford Ex. A at 25; Hartford Reply Ex. A.

Because it is undisputed that the sole source of potential liability in the underlying cases was the above-quoted construction safety clause in Kimball's contract with PennDOT, the resolution of this dispute turns upon whether the clause calls upon Kimball to perform professional or non-professional services. The third circuit has explained the meaning of "professional services" in the context of insurance policy exclusions for professional liability. Such services encompass

> [s]omething more than an act flowing from mere employment or vocation ... [t]he act or service must be such as exacts the use or application of special learning or attainments of some kind. The term "professional" ... means something more than mere proficiency in the performance of a task and implies intellectual skill as contrasted with that used in an occupation for production or sale of commodities. A "professional" act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual. In determining whether a particular act is of a professional nature or a "professional service" we must look not to the title or character of the party performing the act, but to the act itself.

*Harad,* 839 F.2d at 984 (citations omitted).

 Hartford maintains that under this definition of professional services the construction safety clause calls for professional safety inspection services, and that it was Kimball's allegedly inadequate performance of those professional services which created the potential liability in the underlying cases. Based upon the undisputed facts presented

to us by the parties, we disagree. We conclude that the clause unambiguously calls for general, non-professional services. Therefore, the losses suffered by the plaintiffs in the underlying lawsuits are not excluded from coverage by Hartford's policy, and Hartford's motion for summary judgment must be denied.

In support of its argument that the construction safety clause calls for safety inspection services and that those services are "professional" in nature, Hartford has submitted an expert's affidavit describing the responsibilities of an on-site safety inspector. *See* Hartford Ex. F. The affidavit states, and we will assume, that the job of a "road construction site safety inspector" "is enormously complex, requires a vast amount of specialized expertise, and necessitates a long period of training." *Id.* at ¶ 4. Therefore, we will assume that the job is "professional" as defined by *Harad.* However, we are not convinced that this is the role Kimball contracted to perform.

Kimball is an "engineering, architectural and related services firm." Hartford Ex. E at 6. It is undisputed that the work that was *actually done* by Kimball at the job site was work product inspection aimed at determining, and reporting to PennDOT, whether the construction work was in conformity with contractual specifications. Hartford Ex. E at 16–20; CNA Ex. C at 18, 105; CNA Ex. D at ¶ 5; CNA Ex. E at 14–15. These inspection services were overseen by William Armold, who had a high school education and no engineering training. CNA Ex. B at 8. Regina O'Neil, an employee of Kimball's subcontractor, Omega, worked as an inspector under Armold. She has an bachelors degree in engineering, but was working as an inspector, rather than as a civil engineer. CNA Ex. C at 10–11, 13, 18, 30, 105, 133.

Kimball did not believe that it had any contractual obligation to perform safety inspections. Hartford Ex. E at 38; CNA Ex. B at 28. Indeed, George Myers, Kimball's general counsel, senior vice president, and corporate secretary, deposed that Kimball, as a matter of corporate policy, does not contract to provide safety inspection services, Hartford Ex. E at 43–45, and probably would

be incapable of putting together the expertise to institute a safety inspection program or even to oversee someone else's safety program. *Id.* at 53–54. The safety role actually played by Kimball was limited to reporting safety infractions to the job foreman when they were noticed by Kimball employees. CNA Ex. B at 36–37. Thus, it is clear to the court from the undisputed facts that Kimball was not performing professional safety inspection services at the construction site.

Of course, the mere fact that the Kimball employees at the construction site were not professionals in the field of safety inspection, or that Kimball was not providing professional safety inspection services at the time of the accident, does not end our inquiry. If the construction safety clause *calls for* professional safety inspection services, it is irrelevant that Kimball was not providing them. In fact, it would be the very failure to provide adequate and professional services that would subject Kimball to liability in the underlying cases. However, we are convinced that Kimball was not providing professional safety inspection services because its contract with PennDOT did not call for it to do so.

Undisputed evidence submitted by CNA shows that a joint venture of two other defendants in the underlying lawsuits, IA Construction Corporation and Buckley & Company Incorporated ("IA/Buckley"), was "completely responsible for on site safety" at the construction site. IA/Buckley agreed to "conduct safety inspections and file reports," "[e]stablish and provide safety training for personnel," "appoint a competent safety man with authority to police the job," and "[s]ee that the entire safety program is carried out at the work level." CNA Ex. A.

In contrast, Kimball was required only to *assist* PennDOT in obtaining compliance with the safety and accident provisions of the contract. Undisputed deposition testimony from Kimball's on-site supervisor states that Kimball had no authority to instruct IA/Buckley employees as to how to perform their jobs. CNA Ex. B at 36. The fact that a party other than Kimball was "completely responsible for on site safety," while Kimball was required only to *assist* PennDOT indicates that Kimball's role in on-site safety was merely the general, non-professional duty of due care which would be expected on the job from any conscientious and competent contractor.

This conclusion is bolstered by the content of "Section VIII" and the placement of the construction safety clause in Kimball's contract with PennDOT.

The provisions of Section VIII are required by federal regulations to be present in a broad range of federally-funded construction contracts, and in the subcontracts thereto. *See, e.g.,* 40 U.S.C. § 333;[2] 23 C.F.R. § 635.108;[3] 23 C.F.R. Pt. 633, Subpt. B, App. B.[4] Thus, it is impossible to read this

---

**2.** 40 U.S.C. § 333(a) provides:

It shall be a condition of each contract which is entered into under legislation subject to Reorganization Plan Numbered 14 of 1950 (64 Stat. 1267), and is for construction, alteration, and/or repair, including painting and decorating, that no contractor or subcontractor contracting for any part of the contract work shall require any laborer or mechanic employed in the performance of the contract to work in surroundings or under working conditions which are unsanitary, hazardous, or dangerous to his health or safety, as determined under construction safety and health standards promulgated by the Secretary by regulation. . . .

**3.** 23 C.F.R. § 635.108 provides:

Contracts for projects shall include provisions designed:

a) To insure full compliance with all applicable Federal, State and local laws governing safety, health and sanitation; and
b) To require that the contractor shall provide all safeguards, safety devices and protective equipment and shall take any other actions reasonably necessary to protect the life and health of persons working at the site of the project . . . in connection with the performance of the work covered by the contract.

**4.** 23 C.F.R. Pt. 633, Subpt. B, App. B (Required Contract Provisions Appalachian Development Highway System and Local Access Roads Construction Contracts) provides, *inter alia:*

2. . . . [T]he contractor shall insert in each of his subcontracts all of the stipulations contained in these Required Contract Provisions and also a clause requiring his subcontractors to include these Required Contract Provisions in any lower tier subcontracts which they may

provision as calling for professional safety inspection services unless we are willing to conclude that *every* contractor and subcontractor in a broad range of federally funded construction projects is bound to perform those professional services. Such a conclusion would make the concept of professional services so broad that it is meaningless.

The location of the "construction safety" clause in Kimball's contract with PennDOT also indicates that the clause does not require the performance of professional services. The work product inspection services, which the undisputed evidence shows was the work actually performed by Kimball at the construction site, are described in the contract under their own heading, *"Construction Inspection."* In contrast, the construction safety clause is located under the subheading, "Construction Safety," which is under the main heading *"Contract Compliance,"* and is sandwiched between the following provisions:

 A. Labor Compliance.

 The engineer shall assist the Department in obtaining compliance with the labor standards provisions of the contract, particularly Sections IV and V of the Required Contract Provisions and the related wage determination decisions of the Secretary of Labor.

enter into, together with a clause requiring the inclusion of these provisions in any further subcontracts that may in turn be made....

 3. A breach of any of the stipulations contained in these Required Contract Provisions may be grounds for termination of the contract.

 X. Safety: Accident prevention. In the performance of this contract, the contractor shall comply with all applicable Federal, State and local laws governing safety, health and sanitation. The contractor shall provide all safeguards, safety devices and protective equipment and take any other needed actions, on his own responsibility, or as the State highway department contracting officer may determine, reasonably necessary to protect the life and health of employees on the job and the safety of the public and to protect property in connection with the performance of the work covered by the contract.

It is a condition of this contract, and shall be made a condition of each subcontract entered into pursuant to this contract, that the contrac-

 B. Construction Safety

 . . . . . .

 C. Equal Opportunity.

 The engineer shall assist the Department in obtaining compliance with the equal opportunity provisions of the contract, particularly Section II of the Required Contract Provisions and the EEO special provisions.

Hartford Ex. A at 25.

Clearly, neither the "Labor Compliance" clause nor the "Equal Opportunity" clause calls upon Kimball to perform professional engineering services. These two clauses are simply boilerplate, federally mandated provisions which ensure that violations of federal labor and civil rights regulations are also violations of the contract. Similarly, the construction safety clause, which sits between these clauses and mirrors their language, is merely an agreement that Kimball will exercise general non-professional due care in maintaining a safe work environment, will report noticed safety violations, and will comply with federal, state and local safety regulations.

The above considerations lead us to conclude that the construction safety clause of Kimball's contract with PennDOT, which was the undisputed source of potential liability in the underlying lawsuits, calls for general, non-professional services by Kimball.[5]

tor and any subcontractor shall not require any laborer or mechanic employed in performance of the contract to work in surroundings or under working conditions which are unsanitary, hazardous, or dangerous to his health or safety, as determined under construction safety and health standards (Title 29, Code of Federal Regulations, Part 1926, formerly Part 1518, as revised from time to time), promulgated by the United States Secretary of Labor, in accordance with Section 107 of the Contract Work Hours and Safety Standards Act (83 Stat. 96).

**5.** As another grounds for finding that the construction safety clause calls for non-professional services, CNA argues that the term "professional services" used in the Hartford policy's exclusion is not defined in the policy, is ambiguous, and must therefore be read in favor of the insured, Kimball, and against the insurer, Hartford. However, the third circuit confronted a similar professional liability exclusion in *Harad* and found that the phrase "professional liability" is not ambiguous. *See* 839 F.2d at 982–83 & n. 4.

Therefore, the amount paid to settle the underlying cases is not excluded from coverage by the Hartford policy.

An appropriate order follows.

## ORDER

AND NOW, this 24th day of June, 1993, upon consideration of defendant Hartford Accident & Indemnity Company's motion for summary judgment and plaintiff Continental Casualty Company's response thereto, it is hereby ORDERED that the motion is DENIED.