**WIMBERLY ALLISON TONG & GOO, INC., Appellant**

v.

**TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA; Gulf Underwriters Insurance Group.**

No. 08–2976.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit LAR 34.1(a) Nov. 17, 2009.

Filed: Nov. 18, 2009.

Carl A. Salisbury, Esq., Killian & Salisbury, Clark, NJ, for Appellant.

George R. Hardin, Esq., Arthur A. Povelones, Jr., Esq., Hardin, Kundla, McKeon & Poletto, Springfield, NJ, for Appellees.

Before: RENDELL, BARRY and CHAGARES, Circuit Judges.

## OPINION OF THE COURT

RENDELL, Circuit Judge.

Plaintiff Wimberly, Allison, Tong & Goo, Inc. ("WATG") appeals the District Court's grant of summary judgment to Defendants Travelers Property Casualty Company of America ("Travelers") and Gulf Underwriters Insurance Group ("Gulf"). The District Court held that Travelers and Gulf did not have a duty to defend WATG in the underlying actions against WATG arising out of a parking garage collapse during construction on the Tropicana Casino Resort in Atlantic City, New Jersey ("Tropicana").

### I. The Underlying Occurrence

In November 2000, WATG, an architectural firm, entered into an Owner–Architect agreement with Tropicana for the construction of a parking garage. On October 30, 2003, six levels of that parking garage collapsed, causing numerous deaths and serious injuries. Govathlay Givens filed the first lawsuit against WATG and numerous other defendants seeking compensatory and punitive damages arising out of injuries he sustained during the collapse. Givens alleged that WATG failed "to perform as a reasonable architect would under the same or similar circumstances," "failed to properly design the parking garage, failed to properly supervise the con-

struction of the parking garage, failed to provide proper specifications for the construction ... failed to inspect and supervise the work ... and otherwise deviated from the standard of care expected of architects." A. 314. Givens also alleged that WATG "knew or should have known of the dangerous condition of the parking garage ... but failed to take action ..." and that Given suffered injuries as a "result of the negligence, carelessness, recklessness, and/or willful and wanton conduct of [WATG]...." A. 314–15.

A hotel/restaurant near the site of the garage collapse called Another Time, Inc. also filed a complaint against WATG. Another Time alleged negligence, private nuisance, and public nuisance against numerous defendants, including WATG, and sought compensatory and punitive damages. Specifically, Another Time alleged that defendants "unreasonably interfered with the use and enjoyment of the property of the Plaintiff," which resulted in economic loss and diminished property value and that defendants interfered with the right of the public to use and traverse the public streets. A. 341–42. The factual allegations against the defendants that formed the basis for Another Time's claims include violating construction codes, failure to design, construct, and maintain the garage in a way that would ensure it did not collapse, failure to properly supervise the construction, failure to design and follow proper blue prints, and failure to notice warning signs of a danger of collapse.

Many other plaintiffs filed similar suits that were consolidated using a Master Complaint alleging that WATG deviated

from the standard of care of professional architects, that the engineering design of the garage did not conform to Occupational Safety and Health Administration ("OSHA") standards, which caused the collapse of the garage, and that WATG was otherwise careless and negligent. The Master Complaint brought the following claims against all defendants, including WATG: loss of consortium, wrongful death, wrongful death—survivorship, and bystanders' claims for emotional distress.

## II. The Liability Policies

At the time of the garage collapse, WATG had a professional liability policy and an excess professional liability policy with Continental Casualty Company ("CNA"),[1] a commercial liability policy with Travelers, and a commercial excess liability policy with Gulf. The Travelers policy covered damages arising out of "'bodily injury' or 'property damage'" caused by an "'occurrence'" in the "'coverage territory.'" The Travelers policy also contained the following exclusion:

This insurance does not apply to "bodily injury," "property damage," "personal injury" or "advertising injury" arising out of the rendering of or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity.

Professional services include:

1. The preparing, approving, or failing to prepare or approve maps, shop drawings, opinions, reports, surveys,

---

1. WATG alleges that the costs of defense and settlement exceeded the $1 million limit of the CNA primary professional liability policy and the $2 million per occurrence/$5 million aggregate limit of the CNA excess professional liability policy. Specifically, WATG claims that it incurred $2,323,000 in defense costs that were never reimbursed. Appellees contend that WATG's required contribution to a global settlement was $500,000, which was paid by CNA. Appellees' Br. 15, A. 14, A. 402–03.

field orders, change orders, or drawings and specifications; and

2. Supervisory, inspection, architectural or engineering activities.

A. 136.

The Gulf commercial excess liability policy provided that Gulf would pay the "'ultimate net loss' ... which the insured becomes legally obligated to pay as damages because of 'bodily injury,' 'property damage,' 'personal injury' or 'advertising injury' to which this insurance applies." A. 179. Gulf agreed to defend any suit for damages that are not payable by the underlying insurance policy, either because the damages were not covered or because the underlying insurance was exhausted by the payment of claims. Like the Travelers policy, the Gulf policy "does not apply to 'bodily injury,' 'property damage,' 'personal injury,' or 'advertising injury' arising out of: 1. the rendering of; or 2. failure to render; any professional services by or for you." A. 166.

### III. Denial of Coverage

On April 16, 2004, WATG notified Travelers of the *Givens* complaint and several other complaints. On May 12, 2004, Travelers denied coverage based on the professional liability exclusion in the policy, stating that "due to the services you and your subcontractors were performing on this construction project, as architects, coverage would be excluded...." A. 1048. WATG subsequently notified Travelers of additional suits that had been filed and asked Travelers to reconsider its coverage position. On December 17, 2004, Travelers again denied coverage but noted that if a claim against WATG was brought that was unrelated to its professional activities, a duty to defend would arise. Travelers further invited WATG to provide Trav-

ers with any additional information that may impact its decision. In March and May 2005, WATG notified Travelers of additional claims but Travelers' position on the denial of coverage did not change.

On April 16, 2004, WATG also notified Gulf of the underlying lawsuits and requested defense and indemnification. On February 4, 2005, Gulf responded that this request was premature as WATG did not state that primary coverage was exhausted or denied, but nonetheless reserved its right to deny coverage based on the professional liability exclusion. In March 2005, WATG notified Gulf of additional suits and in May 2005 WATG notified Gulf that Travelers was not providing coverage, but Gulf never agreed to defend or indemnify WATG.

### IV. Standard of Review

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(c). After giving the non-moving party all reasonable inferences, there is a genuine issue of material fact if a reasonable jury could find for the non-moving party. *Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 900 (3d Cir.1997) (citations omitted). Our review of the district court's grant of summary judgment is plenary. *Id.* In addition, our review of the interpretation of an insurance contract and the applicability of a policy exclusion is plenary. *Harad v. Aetna Cas. & Sur. Co.*, 839 F.2d 979, 982 (3d Cir.1988).

### V. Duty to Investigate

Under New Jersey law,[2] after an insured notifies an insurer of a potential claim, the insurer has a duty to promptly investigate the claim and notify the in-

---

**2.** All parties agree that New Jersey law is applicable to this case.

sured of the results of the investigation within a reasonable time. *Griggs v. Bertram,* 88 N.J. 347, 443 A.2d 163, 170 (1982).

> Although the insurer cannot ignore known information simply because it is not included in the complaint, the insurer has no duty to investigate possible ramifications of the underlying suit that could trigger coverage. Rather, the insured being sued is responsible for promptly conveying to its insurance company the information that it believes will trigger coverage.

*SL Indus., Inc. v. Am. Motorists Ins. Co.,* 128 N.J. 188, 607 A.2d 1266, 1272 (1992). Even WATG concedes that the defendants need only perform "some semblance" of an investigation and that this need not be " 'fool-proof.' " Appellant's Br. 29 (citing *Universal–Rundle Corp. v. Commercial Union Ins. Co.,* 319 N.J.Super. 223, 725 A.2d 76, 89 (1999)).

▮ WATG claims that the defendants did not even perform a cursory investigation into the claims prior to denying coverage and that the District Court failed to address this issue. While the District Court did not specifically discuss this, it is clear that the defendants fulfilled their duty to investigate the claims. Upon receipt of the letter informing Travelers of the *Givens* complaint, Dawn Minell, a technical specialist at Travelers, spoke to both WATG's corporate counsel and "broker." A. 1034. Minell also reviewed the complete policy and, based on the facts provided as well as the counts in the *Givens* complaint, decided that coverage should be declined. After Minell denied the claim and WATG challenged this denial, the case was reassigned to Lorraine Ankosko, a senior liability technical specialist. Ankosko immediately obtained outside counsel, John Tinker, to ensure an independent and thorough review of coverage. Tinker sent WATG a seven-page letter outlining Trav-

elers' reasons for denying coverage and listing numerous documents that were reviewed in making that decision. Furthermore, Tinker asked WATG to provide Travelers with any addition information if "discovery in the underlying case generates facts supporting a claim of liability against [WATG] unrelated to its professional activities. . . ." A. 1084.

Likewise, Clay Woodman, on behalf of Gulf, reviewed numerous documents provided by WATG and wrote a detailed letter to WATG explaining Gulf's denial of coverage. Furthermore, Gulf maintained that WATG's request for a defense and indemnification was premature because WATG did not indicate that their primary coverage was either exhausted or denied.

Based on the above facts, it is clear that Travelers and Gulf fulfilled their obligation to investigate the underlying claims prior to making a decision on coverage.

## VI. Duty to Defend

An insurer has a duty to defend if the allegations in the complaint, on its face, are encompassed by the risks insured against by the policy. *W9/PHC Real Estate LP v. Farm Family Cas. Ins. Co.,* 407 N.J.Super. 177, 970 A.2d 382, 391 (2009) (citations omitted). Coverage is determined by the "nature of the claim" against the insured, not by how the underlying plaintiff chooses to phrase the complaint. *SL Indus., Inc.,* 607 A.2d at 1272. The duty to defend may arise even if the underlying complaint is meritless because an insurer's duty to defend is broader than its duty to indemnify. *W9/PHC Real Estate LP,* 970 A.2d at 391 (citing *Voorhees v. Preferred Mut. Ins. Co.,* 128 N.J. 165, 607 A.2d 1255, 1259 (1992)). Insurance policies should be given their plain and ordinary meaning, but should be interpreted "liberally in favor of the insured and strictly against the insurer." *Id.* (citations

omitted). If a complaint is ambiguous it should be interpreted in favor of the insured. *Voorhees,* 607 A.2d at 1259 (citations omitted). When the underlying complaint contains multiple causes of action, the insurer has a duty to defend until "every covered claim is eliminated." *Id.*

Professional liability policies and general liability policies are intended to cover different types of risk. *Search EDP, Inc. v. Am. Home Assurance Co.,* 267 N.J.Super. 537, 632 A.2d 286, 288 (1993). Professional liability policies are intended to cover risks inherent to a particular profession, such as the failure to perform with a standard of skill expected, as opposed to risks that arise as with many types of businesses. *Id.* For example, the "professional" aspects of a law practice include giving legal advice, filing suits, etc., whereas the commercial aspects include setting up a business, dealing with staff, paying bills, etc. *Harad,* 839 F.2d at 985. "A professional act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual . . . ." *Id.* at 984 (quotation omitted). The categorization of a party's liability is determined based on the activity that party was involved in at the time the liability arose. *Id.* at 985. "For example, if an attorney, while hosting a real estate closing in his office, places his briefcase on the floor and a colleague trips on it, is injured and sues him, the lawyer's liability would derive not from the rendering of a professional service, but rather from his operation of a business." *Id.*

In analyzing whether a professional services exclusion in a general liability policy applies, courts must examine the "character of the [insured's] conduct" alleged and the "nature of the services" performed by the insured to determine if the insured's

liability "flowed directly" from a professional activity. *Harad,* 839 F.2d at 984–85. Some factors that affect this consideration are whether or not the underlying acts of the insured required the specialized skill and knowledge of someone in the insured's profession, whether the acts were within the normal practice of that profession, and whether the acts were done pursuant to a contract which provided the insured with financial compensation. *Atl. Mut. Ins. Co. v. Cont'l Nat'l Am. Ins. Co.,* 123 N.J.Super. 241, 302 A.2d 177, 181 (1973).

WATG concedes that the professional malpractice exclusions in the policy are valid and applicable to the underlying professional malpractice claims. Appellant's Br. 41. WATG contends, however, that Travelers and Gulf had a duty to defend the underlying actions because those complaints contained both excluded professional malpractice claims and covered claims, such as personal injury, wrongful death, public and private nuisance, bystander emotional distress, and loss of consortium. WATG highlights the fact that both the *Givens* complaint and the *Another Time* complaint allege "general negligence." Appellant's Br. 36. In further support of requiring coverage, WATG points out that the Case Information Statements ("CIS") filed with the underlying complaints did not categorize the complaints as "professional malpractice" and no Affidavits of Merit were filed with the complaints, which are required under New Jersey law if a party alleges professional malpractice.

The bottom line here is that **all** of the allegations against WATG in the *Givens* complaint, the *Another Time* complaint, and the Master Complaint arose out of WATG's professional services as an architect. WATG's only involvement with the garage collapse, which is the basis of the underlying suits, is that they had an Owner–Architect agreement with Tropica-

na and were performing as an architectural firm in accordance with that contract. Plaintiffs have not pointed to any allegations of WATG's conduct that were unrelated to WATG's professional architectural services. Under the guidance of *Harad*, it is clear that the "character" of WATG's "conduct" at issue was professional in "nature" and that therefore WATG's potential liability "flowed directly" from a professional activity, namely architecture. 839 F.2d at 984–85. As the District Court points out, the fact that the plaintiffs did not file Affidavits of Merit or categorize the claims as professional malpractice on the CIS forms is not dispositive because all of the complaints included numerous defendants, some of whom were acting in a professional capacity and some of whom were not. The District Court was correct in concluding that all of WATG's actions or failures alleged in the underlying complaints flowed directly from WATG's professional role as an architect, and that, therefore, the professional services exclusion in both the Travelers and Gulf policies would apply.[3]

## VII. Genuine Issues of Material Fact

On January 29, 2008, both WATG and Defendants filed cross-motions for summary judgment, indicating that all parties believed the matter was ripe for such a decision. The only alleged genuine issues of material fact are discussed above: 1) evidence indicated that there were potentially covered claims of negligence, nuisance, and loss-of consortium alleged in the underlying complaints; 2) no Affidavits of Merit were filed; 3) CIS forms indicated that the underlying claims were not for professional malpractice; and 4) the *Another Time* complaint alleges loss of business, which is not a damage arising from bodily injury or property damage and therefore does not fall under the policy exclusion. All of these allegations arise from WATG's role providing professional architectural services and WATG demonstrates no genuine issue of material fact as to the circumstances leading to any of the underlying allegations.

For the reasons set forth above, we will AFFIRM the Order of the District Court.

---

3. Therefore, we need not address Gulf's contention that even if the exclusion did not apply, WATG is not entitled to coverage from Gulf because CNA had an undisputed duty to defend all of the underlying claims.