

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-28-2008

# Budget Blinds Inc v. White

Precedential or Non-Precedential: Precedential

Docket No. 06-2610

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Budget Blinds Inc v. White" (2008). *2008 Decisions.* Paper 749.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/749

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Case No: 06-2610

BUDGET BLINDS, INC.,

Appellant

v.

VALERIE WHITE;
BUDGET BLINDS OF NJ, INC.;
VAL U BLINDS, INC.

Case No: 06-2733

BUDGET BLINDS, INC.

v.

VALERIE WHITE;
BUDGET BLINDS OF NJ, INC.;
VAL U BLINDS, INC.,

Appellants

On Appeal from the United States District Court
for the District of New Jersey
District Court No. 05-mc-00388
District Judge: The Honorable William J. Martini

Argued April 9, 2008
Before: SMITH, HARDIMAN, and
COWEN, *Circuit Judges*

Howard A. Matalon, Esq.
Stryker, Tams & Dill, LLP
Two Penn Plaza East
Newark, NJ 07105-0000

Jeremiah J. Morgan, Esq. (argued)
Bryan Cave LLP
1200 Main Street
3500 One Kansas City Place
Kansas City, MS 64105-2100

*Counsel for Budget Blinds, Inc.*

Ronald J. Nelson, Esq. (argued)
161 Washington Valley Road
Suite 207, Washington Valley Office Park
Warren, NJ 07059-0000

*Counsel for Valerie White, et al.*

2

(Filed: July 28, 2008)

---

OPINION OF THE COURT

---

SMITH, *Circuit Judge.*

In this appeal, we consider whether a federal district court properly relied on Federal Rule of Civil Procedure 60(b)(6) to vacate a default judgment entered by another district court. We conclude that it did not, and we will remand so that it may consider whether to set aside the default judgment under Federal Rule of Civil Procedure 60(b)(4).

I.

Budget Blinds, Inc. ("BBI") is a California corporation that franchises mobile window covering businesses throughout the United States. According to an affidavit that BBI's Chief Operating Officer filed with the District Court for the Central District of California, BBI was founded in 1992 and had about 800 territories and 570 licensees nationwide as of October 17, 2005, the date of the affidavit. BBI owns and licenses two trademarks that it has registered with the Principal Register of the United States Patent and Trademark Office: (1) the name "Budget Blinds" (registered on December 21, 1993); and (2) a

service mark consisting of the words "Budget Blinds" in a specific font and configuration (registered on February 18, 2003).

Valerie White owns a New Jersey corporation called "Val U Blinds, Inc." that focuses on the design and installation of window blinds. According to an affidavit that White filed with the District Court for the District of New Jersey, she operates this business from a home office in her basement and garage, and her sales are limited to areas of New Jersey. The affidavit further states that she conducted business from 1988 to June 1, 2004 as "Budget Blinds" or "Budget Blinds of NJ," and that she registered her business as a New Jersey domestic corporation in September 1997 under the name "Budget Blinds of NJ, Inc." She changed her business's name to "Val U Blinds" pursuant to the Settlement Agreement that we describe below.

In a letter to Valerie White dated November 25, 2003, BBI's Legal Manager stated that White's use of the name "Budget Blinds" was a violation of BBI's "federal, state, and common law trademark rights" and was likely to cause public confusion about the origin of White's goods. White's attorney Ronald J. Nelson responded in a letter dated December 1, 2003 that White had used the name "Budget Blinds" since 1988, prior to BBI's first use of the name. Nelson's letter added that White had established "Budget Blinds" as a common law trademark in the New Jersey counties served by her business and that BBI's franchisees in this area were infringing her rights by using the

4

name. In a letter to Nelson dated February 12, 2004, BBI's counsel questioned the existence of a common law trademark and stated that "BBI is prepared to bring a lawsuit in California pursuant to the Lanham Act to enjoin your client's infringing activities" if the parties could not reach a mutually-agreeable resolution.

After several additional communications, the parties entered a Settlement Agreement on April 14, 2004. Under the Agreement, BBI would pay White and Budget Blinds of NJ, Inc. (referred to as "the Corporation" in the Agreement) $160,000 "for the purchase and transfer of any and all interest, claim, or ownership in or relating to the trade name and service mark 'Budget Blinds'" and any confusingly similar names or marks. Section 4 of the Agreement provided that after June 1, 2004, White and the Corporation "shall not operate or do business" under the trade name and service mark "Budget Blinds" "or any other name or in any manner that might tend to give the general public the impression that White [or her business] is in any way associated or affiliated with BBI, or any of the businesses conducted by it or other franchisees or licensees of the Marks." Among other things, Section 4 required White to change her existing corporation's name from "Budget Blinds of New Jersey, Inc." to "BB of NJ, Inc.," to conduct all future business using a new corporation to be established under the name "Val U Blinds, Inc.," and to remove the "Budget Blinds" trade name and mark, as well as confusingly similar names or marks, from her company's advertising, signs, letterheads, stationery, printed

5

matter, and other forms. Most importantly for purposes of this litigation, Section 4(f) of the Agreement also instructed White to take specific steps to disassociate her company's telephone number from the name "Budget Blinds." At the time of the Agreement, the *Yellow Pages* directories for Burlington, Gloucester, and Camden Counties listed a phone number for White's company next to the name "Budget Blinds."[1] To address this situation, Section 4(f) of the Agreement provided in relevant part:

> Promptly after execution of this Agreement, White, the Corporation and Val-U Blinds shall direct Verizon . . . in writing, with a copy to counsel for BBI . . . , (i) that all of the said three advertisements shall not be renewed in the said three county editions, or elsewhere; and (ii) that customers calling directory assistance in any of those three counties (or anywhere else) on or after June 1, 2004, should no longer be given [the phone number for White's company] or any other number related to or affiliated with White, the Corporation, or Val-U Blinds in response to an inquiry for the telephone number of "Budget

---

[1] The Agreement refers to these listings as "advertisements," a term whose connotations may be misleading. According to the Agreement itself, the "advertisements" consisted simply of her company's name and phone number in an alphabetical list with other companies' names and numbers.

6

Blinds." From time-to-time thereafter, upon the reasonable request of BBI, White, the Corporation and Val-U Blinds shall provide similar written directions to other directory publishers (including publishers of Internet-based "directories") identified by BBI.

In addition to these substantive provisions, the Agreement stated that White and her corporations "hereby irrevocably appoint BBI as their respective lawful attorney-in-fact with authority to file any document in the name of and on behalf of White, the Corporation or Val-U Blinds for the purpose of taking any of the actions required by this Section 4 upon the event of a Default." Finally, the Agreement contained a choice-of-law clause: "This Settlement Agreement will be governed by and construed under the laws of the State of California."

White says that she made a good-faith effort to comply with her obligations under the Agreement, including those in Section 4(f) related to her telephone number. The record contains a letter dated May 5, 2004 from White's attorney to Verizon Customer Service directing Verizon "not to renew or republish their existing advertisements in all Yellow Pages (including Burlington, Gloucester, Camden and Middlesex County editions) in which they have used the phrase 'Budget Blinds' in whole or in part." The letter also directs Verizon "to instruct Directory Assistance, beginning June 1, 2004, to answer all inquiries for 'Budget Blinds' by not providing the telephone numbers of my client . . . ." The record includes similar letters addressed to YellowPages.com and Verizon.com, both of which are dated June 4, 2004.

Nonetheless, Verizon reprinted the listing that provided the phone number for White's company under the name "Budget Blinds" in the updated print editions of its *Yellow Pages* directories for Burlington, Gloucester, and Camden Counties and the corresponding online directories. In a letter dated February 1, 2005, BBI's counsel informed White's counsel that the continuing existence of these listings was a violation of the Agreement, and that "it appears that the only way to remedy this violation is for your client to assign to BBI or to a franchisee designated by BBI" the telephone number for White's company. In response, White's counsel proposed setting up a recording that would give callers to this telephone number a choice between connecting to White's company or to the local BBI franchisee. BBI rejected this proposal in a letter dated February 23, 2005, reiterating its demand that White assign the number to BBI and stating that it would deem White and her company to be in breach of the Agreement "as long as there is any circumstance under which a person looking in a current telephone book and calling a number listed under the name 'Budget Blinds' will reach your clients." In a letter dated March 9, 2005, White's counsel informed BBI that, although White would do everything that she considered "reasonably possible to mitigate fully the effects of the unauthorized re-printing," she would not surrender the phone number itself.

BBI filed a Complaint against White, Val U Blinds, Inc., and Budget Blinds of NJ, Inc.[2] ("Defendants"), which was

---

[2] The Complaint does not reflect the fact that White had already changed the name from "Budget Blinds of NJ, Inc." to

docketed on April 7, 2005 in the United States District Court for the Central District of California, Southern Division. The Complaint lists eight causes of action: (1) breach of contract; (2) specific performance; (3) federal trademark infringement; (4) state trademark infringement; (5) federal false designation of origin; (6) federal trademark dilution; (7) state trademark dilution; and (8) violation of the California Unfair Competition Act. As relief, BBI requested an injunction against further violation of the agreement,[3] actual and punitive damages, an accounting of defendants' profits, treble damages, costs of suit, attorneys' fees, and pre-judgment interest. The Complaint asserts that venue is proper in the Central District of California "because a substantial part of the events giving rise to Budget Blinds' claims occurred within this District in that the harm to Budget Blinds has occurred in this district and the Defendants have intentionally directed their actions toward Budget Blinds, which is headquartered in this District." The Defendants did not file a response to the Complaint even though BBI sent them notice of it. White's counsel characterizes this as an intentional decision, motivated in part by White's limited resources, to

---

"BB of NJ, Inc."

[3] BBI's Complaint does not explicitly demand that White surrender the phone number to BBI or one of its franchisees. Instead, it requests that White and her company be enjoined and restrained from violating the Agreement, "which requires, in summary, without limitation, that the Defendants discontinue the use and/or display of the Budget Blinds Marks or similar marks or trade names, in any manner whatsoever."

ignore the Complaint on the ground that the California court allegedly lacked personal jurisdiction over the Defendants.

On October 7, 2005, the District Court for the Central District of California entered a default judgment against the Defendants, granting BBI the injunctive relief that it requested in its Complaint and $83,083.51 in monetary relief.[4]  BBI registered this default judgment in the District Court for the District of New Jersey on November 22, 2005.  On January 20, 2006, BBI gave the Defendants notice that it would file a motion on February 14 in the District Court for the District of New Jersey for an order directing the turnover of funds from White's checking account to BBI in the amount specified in the judgment.  On January 24, the Defendants gave notice that they would file a cross-motion in the New Jersey District Court to vacate the default judgment, and they filed a Brief in opposition to the turnover motion and in support of the cross-motion.  In this Brief, the Defendants asserted that the default judgment should be declared null and void because the California district court had lacked personal jurisdiction over them.  In support of this Brief, White submitted an affidavit explaining *inter alia* that neither she nor her company had ever physically entered California, owned property in California, solicited business in

---

[4] This amount reflects $68,613.75 for treble damages and $14,469.76 for attorneys' fees and costs.  BBI's proposed order requested $105,954.76 in monetary relief, which would have reflected an additional $22,871.25 in compensatory damages, but the California district court deleted this amount from the final Order.

10

California, purchased or sold any goods in California, or even maintained an internet website. Both the Brief and White's affidavit asserted that an earlier draft of the Agreement contained a provision granting White's consent to personal jurisdiction in the Central District of California but that the Defendants refused to allow inclusion of this provision in the final Agreement. BBI filed a Memorandum of Law on January 31 opposing the Defendants' cross-motion to vacate the default judgment and arguing that the California court had personal jurisdiction over the Defendants.

On April 5, 2006, the District Court for the District of New Jersey issued an Opinion and Order in response to the parties' motions. *See Budget Blinds v. White*, No. 05-mc-388, 2006 U.S. Dist. LEXIS 17207, 2006 WL 891187 (D.N.J. Apr. 5, 2006). Instead of resolving the personal jurisdiction issue, the District Court vacated the default judgment under Federal Rule of Civil Procedure 60(b)(6), which provides: "On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for . . . any other reason that justifies relief." To decide the Rule 60(b)(6) issue, the District Court employed a three-part test derived from *Harad v. Aetna Casualty & Surety Co.*, 839 F.2d 979 (3d Cir. 1988): "When determining whether to vacate a default judgment, a court should consider the following factors: (1) whether the defendant has a meritorious defense; (2) whether culpable conduct of the defendant led to the default; and (3) whether the plaintiff will be prejudiced." *Budget Blinds*, 2006 U.S. Dist. LEXIS 17207, at *4 (citing *Harad*, 839 F.2d at 982). First, the District Court found that the Defendants had an "extremely" meritorious defense, stating: "The facts establish

11

that White fully complied with her obligations under the settlement agreement and therefore the provision [in the Agreement] staying all litigation is, most likely, still in effect." 2006 U.S. Dist. LEXIS 17207, at *5. Second, the District Court concluded that the culpability factor "arguably benefits either party" because White had "more than a colorable argument that the district court lacked personal jurisdiction" but it would have been "prudent" for her to appear before the California court to make this argument. *Id.* at *5–*6 & n.2. Third, the District Court found that "BBI will suffer absolutely no prejudice should the Court order vacatur." *Id.* at *7. Weighing these three factors, the District Court concluded that vacatur was appropriate. *Id.* at *7–*8.

Even though the briefs of both parties had focused on personal jurisdiction, the New Jersey District Court did not decide this issue, explaining in a footnote that "[t]he Court need not pass on whether the California district court actually possessed personal jurisdiction over White for purposes of a Rule 60(b)(6) inquiry. It is enough to know that White possessed more than a colorable argument that the district court lacked personal jurisdiction." *Id.* at *6 n.2. The District Court did, however, "grant BBI's reasonable legal fees and costs associated with obtaining the default judgment and registering the judgment in this Court," in part because "a prudent attorney" would have responded to BBI's complaint despite his or her belief that the California district court lacked personal jurisdiction. *Id.* at *8. Accordingly, the District Court directed BBI to submit, within 10 days of the Order, an affidavit setting forth the details of the fees and costs expended.

12

On May 5, 2006, BBI filed a timely notice of appeal of the portion of the District Court's Order that vacated the California default judgment. On June 29, 2006, the New Jersey District Court stayed BBI's application for fees and costs pending resolution of this appeal. The District Court had jurisdiction over the registration and enforcement of a foreign judgment pursuant to 28 U.S.C. § 1963 (2000), and we have jurisdiction over BBI's appeal of a final order pursuant to 28 U.S.C. § 1291 (2000). The part of the District Court's Order vacating the default judgment is "final" within the meaning of § 1291, despite the fact that the amount of attorneys' fees remains unresolved. *See Frangos v. Doering Equip. Corp.*, 860 F.2d 70, 72 (3d Cir. 1988) (citing *Budinich v. Becton Dickinson*, 486 U.S. 196, 199 (1988)).

On May 17, 2006, the Defendants filed a notice of cross-appeal of the part of the Order that awarded fees and costs to BBI. Although neither party questioned the existence of appellate jurisdiction over this portion of the Order, we note that the District Court has not quantified the amount of attorneys' fees, and "[i]t has long been the rule in this circuit that this court lacks jurisdiction to examine the merits of an attorneys' fee award where the award has not been quantified." *Frangos*, 860 F.2d at 72. We will vacate the award of fees and costs without considering its merits. The District Court granted the award under its "inherent power under Rule 60(b) to impose terms and conditions upon the opening of a judgment." 2006 U.S. Dist. LEXIS 17207, at *8 (quoting *Feliciano v. Reliant Tooling Co.*, 691 F.2d 653, 657 (3d Cir. 1982)). By vacating the Order opening the judgment, we vacate these conditions as well.

13

III.

Federal Rule of Civil Procedure 55(c) states that a court "may set aside a default judgment under Rule 60(b)." Rule 60(b) lists six reasons for which a "court may relieve a party or its legal representative from a final judgment, order, or proceeding," including the catch-all provision in Rule 60(b)(6) that allows a court to relieve a party from a judgment for "any other reason that justifies relief" aside from the more specific circumstances described in Rules 60(b)(1)–(5). We review grants or denials of relief under Rule 60(b), aside from those raised under Rule 60(b)(4),[5] under an abuse of discretion standard. *See Harris v. Martin*, 834 F.2d 361, 364 (3d Cir. 1987).

The power of a court to invoke Rule 60(b) to vacate its own earlier judgment is unquestioned. As we discuss below, however, it is unclear whether a court has the power to invoke Rule 60(b) to vacate a judgment when the court in which the judgment is registered (the "registering court") is different from the court that entered the judgment (the "rendering court"). Nothing in the text of Rule 55(c) or Rule 60(b) suggests that a registering court lacks the power to vacate the judgment of a different rendering court, but as we discuss below, several courts have suggested otherwise.

---

[5] Our review is plenary when we review determinations under Rule 60(b)(4). *See Page v. Schweiker*, 786 F.2d 150, 152 (3d Cir. 1986).

We decline to establish a categorical rule stating that registering courts lack the power to use Rule 60(b)(6) to vacate the judgments of rendering courts, but we emphasize that registering courts should exercise this power only under very limited circumstances. Even when a court is considering its own judgment, "extraordinary circumstances" must be present to justify the use of the Rule 60(b)(6) catch-all provision to vacate the judgment. *See, e.g.*, *Gonzalez v. Crosby*, 545 U.S. 524, 535–36 (2005) (citing *Ackermann v. United States*, 340 U.S. 193, 199 (1950)). When a court is considering whether to vacate another court's judgment under Rule 60(b)(6), these circumstances must be even more "extraordinary" because of the additional interest in comity among the federal district courts. We need not decide exactly how "extraordinary" a circumstance must be to justify the vacatur of another court's judgment. The circumstances of the instant case would not even be extraordinary enough to justify a court's decision to vacate its own judgment. It follows, *a fortiori*, that they are not extraordinary enough to justify vacating the judgment of another court.

## A.

Several circuits have either held, or stated in dicta, that the power of a federal district court to set aside another district court's judgment is limited.

In *Indian Head National Bank v. Brunelle*, 689 F.2d 245 (1st Cir. 1982), the First Circuit held that "a registration court errs in entertaining a Rule 60(b) motion that alleges neither a judgment void for lack of personal jurisdiction nor grounds that

15

would support an independent equitable action." *Id.* at 251–52. In *Indian Head*, the District Court for the Eastern District of Pennsylvania rendered a default judgment against the defendant, Conproco Corporation. *Id.* at 247. The plaintiff registered the judgment in the District Court for the District of New Hampshire pursuant to 28 U.S.C. § 1963, and attempted to attach Conproco's New Hampshire's bank account. *Id.* Instead of directly appealing the judgment or moving in the rendering court to set it aside, Conproco moved in the District of New Hampshire to set aside the judgment under Rule 60(b)(1) and Rule 60(b)(6), claiming that "the default judgment was due to inadvertence and neglect." *Id.* at 247–48. The New Hampshire district court granted Conproco's motion after finding that Conproco had a valid defense and that the default judgment was not the fault of Conproco or its counsel. *Id.* at 248. The First Circuit reversed, explaining that "there are indications that the drafters of the Rule intended to restrict motion practice under 60(b) to the court which rendered judgment,"[6] and that

---

[6] The First Circuit pointed to the following language in the advisory committee notes to the 1946 amendment that created Rule 60(b):

> Two types of procedure to obtain relief from judgments are specified in the rules as it is proposed to amend them. One procedure is by motion in the court and in the action in which the judgment was rendered. The other procedure is by a new or independent action to obtain relief from a judgment, which action may or may not be begun in the court which rendered the judgment.

16

deference to the rendering court promotes comity among federal courts, efficient judicial administration (in light of the rendering court's familiarity with the issues), and simplified collection of judgments. *Id.* The First Circuit said that a registering court may grant Rule 60(b) relief from a different rendering court's judgment in only two situations: first, when the request for relief is based on grounds that could also support an independent equitable action, *id.* at 249–50 & n.8, and second, when a request for relief from a default judgment is made under Rule 60(b)(4), *id.* at 250–51. Conproco's request for relief did not fit into these categories, so the First Circuit reversed the judgment of the district court granting the relief. *Id.* at 252.

The Seventh Circuit went further in *Board of Trustees v. Elite Erectors, Inc.*, 212 F.3d 1031 (7th Cir. 2000), concluding

689 F.2d at 248 (citing FED. R. CIV. P. 60 advisory committee note). The First Circuit explained that the "other procedure" is a reference to language that now appears under Rule 60(d): "This rule does not limit a court's power to: (1) entertain an independent action to relieve a party from a judgment, order, or proceeding; (2) grant relief under 28 U.S.C. § 1655 to a defendant who was not personally notified of the action; or (3) set aside a judgment for fraud on the court." 689 F.2d at 248–49 & n.7. These actions had been available in both the rendering court and other courts even before the Rule's enactment. *Id.* According to the First Circuit, the first of the two "types of procedure" is a reference to Rule 60(b) motion practice, and the committee's language reflects its understanding that this procedure would be limited to the rendering court. *See id.*

17

that a rendering district court may not "modify or annul" the judgment of another district court under any provision of Rule 60(b), including Rule 60(b)(4). *Id.* at 1034. *Elite Erectors* involved a default judgment rendered in the District Court for the Eastern District of Virginia that the plaintiffs sought to enforce in the District Court for the Southern District of Indiana. *Id.* at 1033. The defendants moved in the Indiana district court to annul the judgment under Rule 60(b)(4) on the ground that the rendering court lacked personal jurisdiction over them. *Id.* The Seventh Circuit held that any request to annul or modify a judgment under Rule 60(b) "must be presented to the rendering court." *Id.* It proceeded to explain that the parties against whom the Virginia district court entered judgment "are entitled to resist enforcement in Indiana if, but only if, the United States District Court for the Eastern District of Virginia lacked personal or subject-matter jurisdiction." *Id.* at 1035. But the Seventh Circuit indicated that "resisting enforcement" of the judgment in Indiana was not the same as "formally annulling it under Rule 60(b)(4)."[7] *Id.* at 1034. The difference is that annulling the judgment would deprive it of its effect in all forums, including the rendering court, whereas successfully resisting the judgment's enforcement would deprive it of its effect only in the Indiana district court. *Id.*

---

[7] Despite this conclusion, the Seventh Circuit did not explicitly overrule its earlier decision in *In re Joint Eastern & Southern District Asbestos Litigation*, 22 F.3d 755 (7th Cir. 1994), which said: "We note that the authority of the registration court to entertain a motion under Rule 60(b)(4) appears to be well established." *Id.* at 762 n.15.

18

Several other circuits have suggested in dicta that Rule 60(b) motions should *generally* be made before the rendering court, but they have not adopted a rigid requirement. In *Covington Industries, Inc. v. Resintex A.G.*, 629 F.2d 730 (2d Cir. 1980), the Second Circuit held that a registering court could invoke Rule 60(b)(4) to vacate a rendering court's judgment for lack of jurisdiction, but it suggested that registering courts should be more restrained when applying other sections of Rule 60(b). *See* 629 F.2d at 733 ("In the usual case, the court of rendition will be more familiar with the facts than the court of registration and perhaps more conversant with the applicable law."). In *Morris ex rel. Rector v. Peterson*, 871 F.2d 948 (10th Cir. 1989), the Tenth Circuit cited *Indian Head* for "the general rule that a registration court . . . usually defers on Rule 60(b) motions to the court rendering the judgment . . . ," but then applied *Indian Head*'s exception for Rule 60(b)(4) motions. *Peterson*, 871 F.2d at 950–51 & n.2 (citing *Indian Head*, 689 F.2d at 249, 251–52). In *Harper Macleod Solicitors v. Keaty & Keaty*, 260 F.3d 389 (5th Cir. 2001), the Fifth Circuit held that a registering court may invoke Rule 60(b)(4) to vacate a rendering court's judgment but expressed doubt in dicta that a registering court could do the same with other sections of Rule 60(b). *See id.* at 395 ("judicial efficiency and comity among district courts often counsel a registering court to defer ruling on Rule 60(b) motions in favor of the rendering court . . . ."). In *FDIC v. Aaronian*, 93 F.3d 636 (9th Cir. 1996), the Ninth Circuit said that "[r]egistering courts generally prefer litigants to bring motions for postjudgment relief in the rendering court," but it concluded that it was proper for a registering court to entertain a challenge to a rendering court's judgment on the ground that the judgment was unconstitutional and therefore

19

void.[8] *Id.* at 649.

We are persuaded by the reasoning of the First, Second, Fifth, Seventh, Ninth, and Tenth Circuits to the extent that they conclude that Rule 60(b) motions (other than motions under Rule 60(b)(4)) should generally be raised in the rendering court. Nonetheless, we decline to hold that registering courts lack the power in all situations to invoke Rule 60(b)(6) to set aside judgments.[9] Rule 60(b)(6) exists so that courts may "vacate judgments whenever such action is appropriate to accomplish justice," *Klapprott v. United States*, 335 U.S. 601, 614 (1949), in situations that are not addressed by the other five clauses of Rule 60(b). The drafters of Rule 60(b)(6) apparently recognized that a catch-all provision would be necessary, since it would be impossible to specify all of the scenarios in which justice might

---

[8] In an earlier decision, the Ninth Circuit indicated that at least some Rule 60(b) motions *must* be brought in the rendering court. In *First Beverages, Inc. v. Royal Crown Cola Co.*, 612 F.2d 1164 (9th Cir. 1980), the Ninth Circuit said: "The proper approach to seeking relief from judgment because of a change in the factual circumstances surrounding this case would be to make a Rule 60(b) motion or a motion to reopen to hear additional proof. Such motions must be directed in the first instance to the district court." *Id.* at 1172. *Aaronian* does not cite *First Beverages*.

[9] We do not consider in this opinion whether a registering court ever has the power to set aside judgments under Rules 60(b)(1), (2), (3), or (5).

20

require vacatur of a judgment. Given the catch-all nature of Rule 60(b)(6), we do not think that it would be wise to adopt a rule that categorically forbids district courts from vacating the judgments of other district courts under this provision.[10] Although the interest in comity[11] will usually make it inadvisable for a registering court to vacate a rendering court's judgment, we cannot rule out the possibility that some set of facts will cause the injustice of enforcing a rendering court's judgment to be so great as to outweigh the damage that setting

---

[10] We also do not think that the language of the advisory committee, as discussed in *Indian Head*, 689 F.2d at 248, requires such a rule. The words of the advisory committee are not as important as the text of the Rule, which imposes no limitations on a court's ability to set aside another court's judgment. Moreover, we note that even though the First Circuit afforded weight to the advisory committee's language, it did not follow it literally, since *Indian Head* acknowledged that a court may use Rule 60(b)(4) to vacate the judgment of another court that lacked personal jurisdiction. *See id.* at 250–51.

[11] When the judgment is not a default judgment, an additional interest exists: efficient judicial administration resulting from the rendering court's greater familiarity with the facts. *See Indian Head*, 689 F.2d at 248. With a default judgment, however, the rendering court is unlikely to have any greater knowledge of the facts than the registering court. *See On Track Transp. v. Lakeside Warehouse & Trucking*, 245 F.R.D. 213, 221 (E.D. Pa. 2007).

21

aside the judgment would inflict upon comity.[12]  We need not decide here what facts would be sufficient, however, because it is clear that the facts of the instant case fall far short of what is necessary to justify vacatur of a rendering court's judgment under Rule 60(b)(6).

## B.

Although the text of Rule 60(b)(6) states simply that a court may grant relief from a final judgment for "any other reason that justifies relief," courts have added a requirement that a party seeking Rule 60(b)(6) relief must demonstrate the existence of "extraordinary circumstances"[13] that justify

---

[12] Any such set of facts would probably be sufficient to form the basis of an "independent equitable action" within the meaning of the exception that the First Circuit described in *Indian Head*.  *See* 689 F.2d at 249 & n.8.  We need not decide here whether it is possible for a court to be confronted with a set of facts that could not support an independent equitable action but could nonetheless justify vacating another court's judgment under Rule 60(b)(6).

[13] Our circuit uses the terms "extraordinary circumstances" and "exceptional circumstances" interchangeably when discussing Rule 60(b)(6). *See, e.g.*, *Lasky v. Continental Prods. Corp.*, 804 F.2d 250, 252 (3d Cir. 1986) (using both terms in the same paragraph); *Boughner v. Sec'y of Health, Educ. & Welfare*, 572 F.2d 976, 978 (3d Cir. 1978) (concluding that "the circumstances here are sufficiently exceptional and

reopening the judgment. *See, e.g.*, *Crosby*, 545 U.S. at 535–36 (citing *Ackermann*, 340 U.S. at 199); *Coltec Indus. v. Hobgood*, 280 F.3d 262, 273 (3d Cir. 2002) (quoting *In re Fine Paper Antitrust Litig.*, 840 F.2d 188, 194 (3d Cir. 1988)). This requirement exists in order to balance the broad language of Rule 60(b)(6), which allows courts to set aside judgments for "any" reason justifying relief, with the interest in the finality of judgments. *See In re Fine Paper Antitrust Litig.*, 840 F.2d at 194–95; *Mayberry v. Maroney*, 558 F.2d 1159, 1163 (3d Cir. 1977). As we explained above, when a registering court considers the judgment of a *different* district court, the use of Rule 60(b)(6) to vacate another court's judgment implicates an additional interest in comity, even if the judgment was a default judgment. If the circumstances of a case are not sufficiently "extraordinary" to outweigh the interest in the finality of judgments, then it follows that the circumstances cannot outweigh the interest in finality combined with the interest in comity.

We have explained that a showing of extraordinary circumstances involves a showing that without relief from the judgment, "an 'extreme' and 'unexpected' hardship will result." *Mayberry*, 558 F.2d at 1163. This "hardship" requirement may sometimes be satisfied when the judgment "precluded an adjudication on the merits." *Boughner v. Sec'y of Health, Educ. & Welfare*, 572 F.2d 976, 978 (3d Cir. 1978). But extraordinary circumstances rarely exist when a party seeks relief from a

extraordinary so as to mandate relief pursuant to Rule 60(b)(6) . . . .").

23

judgment that resulted from the party's deliberate choices.[14] *See, e.g.*, *Coltec*, 280 F.3d at 274 ("[C]ourts have not looked favorably on the entreaties of parties trying to escape the consequences of their own 'counseled and knowledgeable' decisions."); *see also Ackermann*, 340 U.S. at 198–99 (petitioner could not show the existence of extraordinary circumstances when he voluntarily chose not to appeal due to the modest expenses that an appeal would require).

In the instant case, the New Jersey District Court did not mention the "extraordinary circumstances" requirement in its opinion. We acknowledge that our decision in *Harad* may have contributed to this error by sending confusing signals to the District Court regarding the standards for vacating a default judgment. In *Harad*, we reversed the district court's decision not to vacate its own earlier default judgment. 839 F.2d at 985. We stated that "the decision to vacate a default judgment is left to the sound discretion of the trial court," but that "[i]n exercising this discretion . . . the court must consider whether vacating the default judgment will visit prejudice on the plaintiff, whether the defendant has a meritorious defense, and

---

[14] In *Boughner*, we invoked Rule 60(b)(6) to relieve appellants of an adverse judgment resulting from the intentional acts of their attorney. 572 F.2d at 979. But we only did so after finding that the attorney's "egregious conduct amounted to nothing short of leaving his clients unrepresented." *Id.* at 977. Given this factual setting, we held that "appellants are not bound by the acts of their attorney for the purposes of the rule." *Id.* at 978.

whether the default was the result of the defendant's culpable conduct." *Id.* at 982. *Harad* makes no reference to any clause in Rule 60(b), nor does it consider whether "extraordinary circumstances" were present. Thus, *Harad* may have created the erroneous impression that an exception to the "extraordinary circumstances" requirement exists when a district court is considering whether to vacate a default judgment, as opposed to a judgment on the merits.

A closer look at *Harad* reveals that its test was not intended to apply to Rule 60(b)(6). *Harad* involved a complaint filed by an attorney (Charles Harad) and one of his insurance companies (Home), against another of his insurance companies (Aetna), seeking a declaratory judgment that Aetna had a duty to defend and indemnify Harad. 839 F.2d at 981. On December 23, 1986, Harad and Home served the complaint on Aetna at its Hartford office rather than the Philadelphia office with which they had negotiated previously. *Id.* The Hartford office forwarded the complaint to the Philadelphia office, and Aetna entered an appearance with the District Court for the Eastern District of Pennsylvania on January 9, 1987, the same day that Harad and Home filed a request for a default judgment. The district court docketed the default judgment request on January 12 and the entry of appearance on January 14, and then granted the request for default judgment on January 14. *Id.* Aetna moved to vacate the default judgment, and the parties stipulated that the sole issue to be addressed on the motion was whether Aetna had established a meritorious defense to the plaintiffs' action. *Id.* The district court then declined to vacate the default judgment, but we reversed, concluding that Aetna had a meritorious defense. *Id.* at 985. Although neither the district

court's opinion, *see Harad v. Aetna Cas. & Sur. Co.*, No. 86-cv-7266, 1987 WL 12290 (E.D. Pa. June 9, 1987), nor our opinion cited any Federal Rule of Civil Procedure, we see at least two reasons for construing *Harad* as a grant of relief under Rule 60(b)(1), which allows relief from a judgment on the basis of "mistake, inadvertence, surprise, or excusable neglect," rather than Rule 60(b)(6). First, the facts of the case, with the complaint sent to the wrong office and the apparent delay in docketing the entry of appearance, suggest that this was a matter of "mistake, inadvertence, surprise, or excusable neglect." Second, *Harad* obtains its three-part test directly from *United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192 (3d Cir. 1984), a case that addresses Rule 60(b)(1). *See Harad*, 839 F.2d at 982 (citing *$55,518.05 in U.S. Currency*, 728 F.2d at 195). In *$55,518.05 in U.S. Currency*, we said:

> We require the district court to consider the following factors in exercising its discretion in granting or denying a motion to set aside a default under Rule 55(c) or *a default judgment under Rule 60(b)(1)*: (1) whether the plaintiff will be prejudiced; (2) whether the defendant has a meritorious defense; (3) whether the default was the result of the defendant's culpable conduct.

*$55,518.05 in U.S. Currency*, 728 F.2d at 195 (emphasis added).[15] Accordingly, we conclude that the District Court erred

---

[15] *$55,518.05 in U.S. Currency* cited three cases as its authority for this test. 728 F.2d at 195. First, it cites *Gross v.*

26

by relying solely on the three factors listed in *Harad* to grant relief under Rule 60(b)(6).

Appellees assert that *Emcasco Insurance Co. v. Sambrick*, 834 F.2d 71 (3d Cir. 1987), provides the appropriate factors for deciding whether to set aside a default judgment. In *Emcasco*, we applied the same three factors that we used in *Harad*, plus a fourth—"the effectiveness of alternative sanctions." *Id.* at 73. *Emcasco* does not cite Rule 60(b) in its review of the district court's decision not to vacate a default judgment. As with *Harad*, however, we construe *Emcasco* as describing a standard for vacating a default judgment under Rule 60(b)(1), not Rule 60(b)(6). First, we think that the default

---

*Stereo Component Systems, Inc.*, 700 F.2d 120 (3d Cir. 1983), a case applying Rule 60(b)(1). *See* 700 F.2d at 121–22 & n.1. Second, it cites *Feliciano v. Reliant Tooling Co.*, 691 F.2d 653 (3d Cir. 1982). *Feliciano* applies Rule 60(b) as a whole and expressly declines to choose between Rule 60(b)(1) and Rule 60(b)(6) as its basis for relief. *See Feliciano*, 691 F.2d at 656. Although *Feliciano* suggests that the three-part test might apply to Rule 60(b)(6), it does not make this a part of its holding. Thus, we do not think that *Feliciano* stands for the proposition that the three-part test is sufficient to guide a Rule 60(b)(6) inquiry. Third, *$55,518.05 in U.S. Currency* cites *Farnese v. Bagnasco*, 687 F.2d 761 (3d Cir. 1982). *Farnese* is concerned with whether to set aside an "entry of default" as opposed to a "default judgment." *See Farnese v. Bagnasco*, 687 F.2d at 763–64 (citing FED. R. CIV. P. 55(c) (stating that a court may set aside an entry of default "for good cause")).

27

judgment in *Emcasco* could be fairly described as the product of "mistake, inadvertence, surprise, or excusable neglect."[16] The *Emcasco* district court decided on January 14, 1987 that it would enter a default judgment against the defendant unless he filed an answer by January 16. 834 F.2d at 75. But the defendant and his counsel were never informed of this decision and instead

---

[16] *Emcasco* involved a suit by an insurance company (EMCASCO) against an insured (Louis Sambrick) for a declaratory judgment stating that the insurance policy did not cover personal injuries that Sambrick had allegedly inflicted on two other people. 834 F.2d at 72. EMCASCO served Sambrick with its complaint on December 2, 1986, but Sambrick, who was not represented by counsel, did not file a timely answer. *Id.* at 72–73. On December 31, EMCASCO served the still-unrepresented Sambrick with an affidavit requesting default judgment. *Id.* at 73. After Sambrick retained counsel, the district court held a telephone conference with EMCASCO on January 14, 1987, but neither Sambrick nor his counsel participated in it, apparently because they were not notified. *Id.* During the telephone conference, the district court told EMCASCO that it would enter a default judgment unless Sambrick filed an answer by January 16. *Id.* Sambrick and his counsel were not told of this arrangement, but instead were led to understand that they could avoid a default judgment if Sambrick's counsel entered an appearance, which Sambrick's counsel did on January 15. *Id.* On January 16, the district court entered a default judgment against Sambrick. *Id.* The district court subsequently rejected Sambrick's motion to set aside the default judgment. *Id.*

28

were erroneously told that they could avert a default judgment merely by entering an appearance, which they did on January 15. *Id.* Given these facts, *Emcasco* was in effect a Rule 60(b)(1) case. Second, most of the cases that *Emcasco* cites in support of its four-part test are applications of Rule 60(b)(1). *See* 834 F.2d at 73–74.[17]  Thus, *Emcasco* does not provide a test that is

_____

[17] In support of its four-factor test, *Emcasco* cites nine cases. *See* 834 F.2d at 73–74 (citing *Zawadski De Bueno v. Bueno Castro*, 822 F.2d 416, 419–20 (3d Cir. 1987); *Scarborough v. Eubanks*, 747 F.2d 871, 875–78 (3d Cir. 1984); *Hritz v. Woma Corp.*, 732 F.2d 1178, 1181 (3d Cir. 1984); *$55,518.05 in U.S. Currency*, 728 F.2d at 194–95; *In re MacMeekin*, 722 F.2d 32, 35 (3d Cir. 1983); *Gross*, 700 F.2d at 122; *Feliciano*, 691 F.2d at 656; *Farnese*, 687 F.2d at 764; *Donnelly v. Johns-Manville Sales Corp.*, 677 F.2d 339, 342 (3d Cir. 1982)).  We have already discussed *$55,518.05 in U.S. Currency*, *Gross*, *Feliciano*, and *Farnese*.  *See supra* note 15.  *Zawadski* is expressly based on the "excusable neglect" factor of Rule 60(b)(1). 822 F.2d at 417–18 & n.1.  Our opinion in *Hritz* refers to Rule 60(b) as a whole rather than any of the six clauses.  *See Hritz*, 732 F.3d at 1182 n.3; *see also id.* at 1186 n.1 (Garth, J., concurring).  The district court's opinion in *Hritz*, however, makes clear that the order being appealed was based on Rule 60(b)(1).  *See Hritz v. Woma Corp.*, 92 F.R.D. 364, 366 (W.D. Pa. 1981).  *Scarborough* and *Donnelly* are direct appeals of grants of dismissal under Rule 41, not appeals of a decision granting or denying a motion to set aside a previously-entered default judgment.  *Scarborough*, 747 F.2d at 874–75; *Donnelly*, 677 F.2d 340–41.  Similarly, *MacMeekin* is a direct appeal of a

applicable to a Rule 60(b)(6) motion.

We acknowledge that default judgments are generally disfavored in our circuit. *See $55,518.05 in U.S. Currency*, 728 F.2d at 194–95 ("[T]his court does not favor entry of defaults or default judgments. We require doubtful cases to be resolved in favor of the party moving to set aside the default judgment 'so that cases may be decided on their merits.'" (quoting *Tozer v. Charles A. Krause Milling Co.*, 189 F.2d 242, 244 (3d Cir. 1951))). But we cannot apply this presumption against default judgments if doing so would be inconsistent with the Federal Rules of Civil Procedure or our case law interpreting these Rules. Because "extraordinary circumstances" are essential for a grant of Rule 60(b)(6) relief, a case does not become "doubtful" when the district court has made no attempt to show that such circumstances exist.

Finally, our own review of the record does not suggest that the circumstances of this case are "extraordinary" as we have defined this term in our case law. The Defendants acknowledge that their decision not to contest the California judgment was the result of a deliberate choice. Thus, the default judgment cannot be said to have created an "unexpected hardship." *Cf. Boughner*, 572 F.2d at 978. Since nothing else in the record appears to qualify as an "extraordinary circumstance" sufficient to justify setting aside *any* judgment, let alone one entered by a different court, we will vacate the District Court's Order setting aside the default judgment.

---

dismissal under Rule 37. 722 F.2d at 34–36.

30

IV.

We next confront a question that parallels the one we addressed about Rule 60(b)(6): does a federal district court have the power to consider a motion to vacate another district court's judgment under Rule 60(b)(4) on the ground that the latter court lacked personal jurisdiction over the defendant? Neither party has contended that the District Court lacks this power. Nevertheless, we will explain why we hold that this power exists.

Rule 60(b)(4) allows a court to relieve a party from a final judgment if "the judgment is void." A judgment is void within the meaning of Rule 60(b)(4) if the court that rendered it lacked personal jurisdiction over the defendant. *See Marshall v. Bd. of Educ.*, 575 F.2d 417, 422 (3d Cir. 1978). Although there is no question that a court may grant a Rule 60(b)(4) motion to vacate one of its own judgments, we have not explicitly ruled on whether a court has the power to grant a Rule 60(b)(4) motion to vacate another court's judgment for lack of personal jurisdiction.[18]

Five circuits have stated either in holdings or dicta that a registering court has the power to hear a Rule 60(b)(4) motion.

---

[18] In *In re Universal Display & Sign Co.*, 541 F.2d 142 (3d Cir. 1976), we allowed a registering court to consider a Rule 60(b)(4) motion, but we noted that the party seeking to enforce the judgment had not objected to the registering court's power to do so. *Id.* at 143 n.6.

Three of these circuits explicitly held that a registering court may vacate a default judgment of a rendering court when the rendering court lacked personal jurisdiction over the defendant. *Covington*, 629 F.2d at 732–34 (Second Circuit); *Harper Macleod*, 260 F.3d at 394–95 (Fifth Circuit); *Peterson*, 871 F.2d at 951 & n.2 (Tenth Circuit). The First Circuit endorsed the view of these circuits in dicta, recognizing that Rule 60(b)(4) challenges to default judgments are one of the two exceptions to the general rule that Rule 60(b) motions must be addressed to the rendering court. *See Indian Head*, 689 F.2d at 250–51. The Ninth Circuit endorsed a registering court's power to vacate a rendering court's judgment under Rule 60(b)(4), but its holding addressed a Rule 60(b)(4) motion based on a challenge to the constitutionality of the rendering court's judgment rather than the rendering court's personal jurisdiction. 93 F.3d at 639–40. We note that the Eastern District of Pennsylvania has produced a thorough and well-reasoned opinion in *On Track Transportation, Inc. v. Lakeside Warehouse & Trucking, Inc.*, 245 F.R.D. 213 (E.D. Pa. 2007), in which it held that a registering court has the power to decide a Rule 60(b)(4) motion challenging a rendering court's default judgment for lack of subject matter jurisdiction. *Id.* at 214–23.

The Seventh Circuit is an outlier on this issue. As we discussed above, the Seventh Circuit concluded in *Elite Erectors* that the registering court "was free to disregard the judgment, without formally annulling it under Rule 60(b)(4), if the rendering court lacked [personal or subject-matter] jurisdiction." 212 F.3d at 1034–35. Because the registering court cannot annul the judgment under Rule 60(b)(4), the most it can do is decline to enforce the judgment—while leaving the judgment in

32

place so that other jurisdictions can enforce it. *See id.* As the Eastern District of Pennsylvania noted in *On Track*, this is an "impracticable" solution. *See* 245 F.R.D. at 219–20. If the rendering court merely issued a default judgment, then it never actually litigated the issue of personal jurisdiction. In contrast, the registering court will have actually litigated the issue. Thus, the registering court's judgment will have preclusive effect, and a defendant "could then move the rendering court to vacate the judgment on the basis that it lacked jurisdiction, using the decision of the registering court offensively." *Id.* This would lead to the same result as vacating the judgment altogether, except with one extra step, along with the expenditure of time and resources that this step would entail. *Id.* at 220. We see no reason to break with the majority of circuits and embrace the cumbersome process endorsed by the Seventh Circuit.

Finally, we do not think a registering court seriously threatens the interest in comity when it vacates a rendering court's default judgment under Rule 60(b)(4) for lack of personal jurisdiction. If the rendering court did not have personal jurisdiction, then the judgment was not merely erroneous; it never should have been entered in the first place. Moreover, when the rendering court enters a *default* judgment based on nothing but one party's failure to appear, there is no risk that the courts will reach opposite conclusions on personal jurisdiction because the rendering court was not required to address the issue. Finally, as the *On Track* court noted, comity "must be balanced against the longstanding principle that '[a] defendant is always free to ignore the judicial proceedings, risk a default judgment, and then challenge that judgment on jurisdictional grounds in a collateral proceeding.'" 245 F.R.D.

33

213, 221 (citing *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 706 (1982)). The latter principle would be undermined if we held that Rule 60(b)(4) actions could only be brought in the rendering court that allegedly lacked personal jurisdiction over the defendant.

## V.

We now reach the question that the parties originally asked the District Court to address: whether the California district court possessed personal jurisdiction over the Defendants. We have the power to resolve this issue ourselves, rather than remand it to the District Court, because we conduct *de novo* review of jurisdictional issues raised under Rule 60(b)(4). *See Page v. Schweiker*, 786 F.2d 150, 152 (3d Cir. 1986). Both parties have informed us in their briefs and at oral argument that they would prefer that we resolve the issue rather than remand it. Unfortunately, we are unable to do so, because we find that the existence of personal jurisdiction turns on disputed questions of fact that should be resolved by a factfinder. Therefore, we remand the matter to the District Court, with the hope that the District Court will resolve this matter as promptly and as inexpensively for the parties as possible. Below we provide an overview of the personal jurisdiction issues in this case, pointing out what we believe are the key factual disputes.

### A. Personal Jurisdiction in California

"In a diversity action, [a California federal district court] may exercise personal jurisdiction over a non-resident defendant

34

if jurisdiction is proper under California's long-arm statute and if that exercise of jurisdiction accords with federal constitutional due process principles." *Fireman's Fund Ins. Co. v. Nat'l Bank of Coops.*, 103 F.3d 888, 893 (9th Cir. 1996). California's long-arm statute provides simply that the court may exercise personal jurisdiction "over a non-resident defendant on any basis not inconsistent with the California or federal Constitution." *Id.* (citing CAL. CODE CIV. PROC. § 410.10). "The statutory and constitutional requirements therefore merge into a single due process test," which requires that the defendant "have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.* (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation omitted)). As both parties acknowledge, we determine whether this requirement is satisfied by applying a three-part test. The three-part test, as summarized in *Panavision International v. Toeppen*, 141 F.3d 1316 (9th Cir. 1998), is as follows:

> (1) The nonresident defendant must do some act or consummate some transaction with the forum or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or results from the defendant's forum-related activities; and (3) exercise of jurisdiction must be reasonable.

141 F.3d at 1320 (citation omitted). BBI contends that all three of these requirements were satisfied as a matter of law.[19]

## B. Purposeful Availment

BBI asserts that White has purposefully availed herself of the privilege of conducting activities in California and thereby has invoked the benefits of California law. BBI bases its argument on the Settlement Agreement as well as the Defendants' alleged trademark infringement.

### 1. Purposeful Availment Through The Settlement Agreement

The mere existence of a contract is insufficient to establish minimum contacts. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985) ("If the question is whether an individual's contract with an out-of-state party alone can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot."). But a contract is typically an intermediate step between past negotiations and future transactions, and *Burger King* instructs that "it is these factors— prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts with the forum." *Id*. at 479. BBI argues that several aspects of the Settlement Agreement's terms,

---

[19] BBI argues only that "specific jurisdiction" exists and does not seek to prove the existence of "general jurisdiction."

as well as prior negotiations and contemplated future consequences, create minimum contacts.

First, BBI points out that the Agreement contains a choice-of-law clause stating that it "will be governed by and construed under the laws of the State of California." Br. of Appellant 39. As *Burger King* points out, a choice-of-law provision "standing alone would be insufficient to confer jurisdiction," but combined with other factors, it may reinforce a party's "deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there." 471 U.S. at 482. We must therefore consider other factors before we can decide how much weight to afford to this provision.

Second, BBI points out that the Defendants negotiated the Settlement Agreement by telephone and mail with California-based BBI and its attorneys. Br. of Appellant 40. Interpreting California law, the Ninth Circuit has said that, ordinarily, use of the mails and telephone "simply do not qualify as purposeful activity invoking the benefits and protection of the [forum] state." *Roth v. Garcia Marquez*, 942 F.2d 617, 622 (9th Cir. 1991) (quoting *Thos. P. Gonzalez Corp. v. Consejo Nacional De Produccion De Costa Rica*, 614 F.2d 1247, 1254 (9th Cir. 1980)). Moreover, an important distinction between the negotiations in *Burger King* and those in the instant case is that the *Burger King* defendant actively sought contract negotiations with a company based in the forum state, whereas White did not reach out to anyone in California until BBI threatened litigation. *See Burger King*, 471 U.S. at 479 ("Eschewing the option of operating an independent local enterprise, Rudzewicz deliberately '[reached] out beyond'

37

Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise and the manifold benefits that would derive from affiliation with a nationwide organization.").

Third, BBI asserts that the Defendants established minimum contacts "by accepting BBI's settlement payment which was wired from a California bank to defendants."  Br. of Appellant 41.  To underscore the importance of this payment, BBI cites a case from the Southern District of Mississippi, *Medical Assurance Co. of Mississippi v. Jackson*, 864 F. Supp. 576 (S.D. Miss. 1994). *Jackson* involved a suit brought by a Mississippi-based medical malpractice insurance company against two Alabama residents: Moore, the victim of a botched operation in Mississippi that created a need for additional surgery; and Jackson, Moore's attorney.  *Id.* at 577.  Jackson threatened to sue the insurance company on Moore's behalf and demanded a $1,100,000 settlement.  *Id.*  After "a series of letters and telephone calls," Moore agreed to a settlement of $56,250 from the insurance company in exchange for an absolute release.  *Id.*  Jackson and Moore accepted and negotiated the $56,250 check that the insurance company tendered, but they refused to execute the absolute release that the company had also sent them.  *Id.*  They returned an altered version of the release form instead.  *Id.* at 578.  The insurance company sued Jackson and Moore in a Mississippi federal district court, alleging breach of the settlement agreement.  *Id.* at 578.  Jackson and Moore claimed that the court lacked personal jurisdiction over them because the insurance company had sent the payment and the release documents to Alabama.  *Id.* The court rejected their claim, pointing out that "the check was sent from Mississippi and was ultimately paid by a Mississippi

38

bank," that "the release, which is central to this action" was sent from Mississippi and was to be returned to Mississippi, and that "defendants did, in fact, return a [modified] release document" to Mississippi. *Id.* Moreover, the court pointed out that Jackson initiated the transaction by threatening to sue the Mississippi-based insurance company. *Id.* at 579.

Despite some superficial similarities, *Jackson* is distinguishable. Although White and her attorney, like Moore and Jackson, accepted payment from a bank located in the forum state in exchange for accepting a settlement agreement, they did not initiate the transaction by threatening to sue a California company.[20] Also, whereas Moore had traveled to Mississippi for surgery performed by a Mississippi doctor, 864 F. Supp. at 577, White had not directed any activities toward California before BBI contacted her. Thus, even if we regard *Jackson* as persuasive authority, it does not compel a finding of purposeful availment.

Fourth, BBI argues that the parties contemplated future consequences. Among other things, the Agreement states that the Defendants "hereby irrevocably appoint BBI as their respective lawful attorney-in-fact with authority to file any document in the name of and on behalf of [the Defendants] for the purpose of taking any of the actions required by [Section 4 of the Agreement] upon the event of a default." We agree that

---

[20] White's attorney did respond to BBI's warnings of a lawsuit with hints of a countersuit. Nonetheless, it was BBI that set events in motion.

the attorney-in-fact provision suggests that the parties contemplated future consequences to some extent. Still, a large gulf exists between the future contacts contemplated by this provision and the extensive future contacts contemplated by the *Burger King* contract. Whereas the *Burger King* defendant "entered into a carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida," *id.* at 480, the Settlement Agreement merely describes what will happen in the event of default.

In sum, we question whether any of the factors that BBI cites (the choice of law clause, the mail and telephone negotiations, the acceptance of the settlement check, and the attorney-in-fact provision) would individually support purposeful availment. The combined force of these factors, however, may be sufficient. On the other hand, White has asserted that the original agreement contained a clause consenting to personal jurisdiction in California that the parties removed at White's insistence. If true, this suggests that we should hesitate to read the terms of the contract, especially the choice-of-law clause, as indicative of the "reasonable foreseeability of possible litigation" in California court.[21] *See*

---

[21] Of course, even if White could prove that she refused to consent to personal jurisdiction in California during the contract negotiations, this would not matter if the events surrounding the contract otherwise indicate that she has purposely availed herself of that forum. In this case, however, BBI suggests that we can interpret the choice-of-law clause as probative of White's acquiescence to litigation in a California court, since

40

471 U.S. at 482. BBI contests this fact, and we do not have evidence of it in the record other than White's affidavit and brief. Therefore, on remand the District Court may wish to investigate White's claim regarding the contract negotiations, since it could shed light on the extent to which the parties contemplated an ongoing relationship with California, including the possibility of litigation there.[22]

### 2. Purposeful Availment Through Trademark Infringement

BBI contends that the Defendants' alleged trademark infringement created personal jurisdiction in California because the Defendants purposefully directed their activities toward that forum. Br. of Appellant 42. Relying on the "effects test" of *Calder v. Jones*, 465 U.S. 783 (1984), BBI says that purposeful availment exists if the defendant "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that

California courts are more familiar with California law than other courts. If White specifically objected to a clause consenting to personal jurisdiction, this counsels us against such an interpretation of the choice-of-law clause.

[22] At oral argument, BBI said that the District Court would be unable to consider this evidence on remand because it would violate the parol evidence rule. But the issue here is not how to interpret the contract, but whether personal jurisdiction exists. This requires an inquiry into "prior negotiations," *Burger King*, 471 U.S. at 479, even when the contract purports to be the entire agreement between the parties.

the defendant knows is likely to be suffered in the forum state." *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002) (summarizing *Calder*'s "effects test").

BBI contends that trademark infringement "is treated as an intentional tort for jurisdictional purposes." The first case that BBI cites for this proposition is *Sebastian Int'l, Inc. v. Russolillo*, No. 00-03476 CM, 2000 U.S. Dist. LEXIS 21510 (C.D. Cal. Aug. 25, 2005). In *Russolillo*, the court held that the defendant's trademark infringement through the sale of counterfeit goods was "intentional" because the plaintiff had written a letter to put the defendant on notice of the infringement. 2000 U.S. Dist. LEXIS 21510, at *13. BBI claims that *Russolillo* is analogous to the instant case, because BBI informed the Defendants of their infringement in 2003, prior to the settlement, and informed them of their continuing infringement on February 1, 2005. The second case that BBI cites is *Panavision*. In *Panavision*, the court stated that although the defendant's registration of the plaintiff's trademark as a domain name was not sufficient to establish jurisdiction in the forum state, the defendant's "scheme to register [the plaintiff's] trademarks as his domain names for the purpose of extorting money" from the plaintiff was an intentional act directed at the forum state.[23] 141 F.3d at 1322. The instant case is

---

[23] BBI provides a misleading description of *Panavision*, saying that it held that the "effects test" is "satisfied where plaintiff alleged infringement of trademark due to defendant's use of plaintiff's trademark as domain name." This is directly contrary to the court's language requiring "something more"

distinguishable from both *Russolillo* and *Panavision*. In *Russolillo*, the court indicated that it was the explicit warning about trademark infringement, not the act of counterfeiting itself, that rendered the defendant's trademark infringement "intentional." 2000 U.S. Dist. LEXIS 21510, at *13. Although BBI also sent a warning to the Defendants, the record suggests that the Defendants acted in good faith to remedy the alleged infringement. If this is true, then any ongoing "infringement" was not the result of intentional acts on the Defendants' part—unless we agree with BBI's claim that surrendering control of the telephone number was absolutely necessary to prevent further infringement. *Panavision* supports the Defendants, because it makes clear that the mere *use* of another party's trademark (i.e., registration of domain names and creation of web sites) does not constitute an intentional act aimed at the forum state for jurisdictional purposes. 141 F.3d at 1322. It is possible, however, that the District Court's findings

---

than use of a trademark as a domain name:

> We agree that simply registering someone else's trademark as a domain name and posting a web site on the Internet is not sufficient to subject a party domiciled in one state to jurisdiction in another. . . . [T]here must be 'something more' to demonstrate that the defendant directed his activity toward the forum state. Here, that has been shown.

*Panavision*, 141 F.3d at 1322 (citation omitted).

43

of fact will reveal more about whether White's behavior can be construed as "intentional."

BBI also contends that the Defendants' behavior was "expressly aimed at the forum state."  We do not find it immediately obvious why the failure to change New Jersey telephone listings and to surrender a New Jersey telephone number is behavior "expressly aimed" at California.  But BBI relies on language in *Bancroft & Masters v. Augusta National*, 223 F.3d 1082 (9th Cir. 2000), which states that "the ['expressly aiming'] requirement is satisfied when the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state." 223 F.3d at 1086.  Even though the Defendants' alleged infringement was limited to activities in New Jersey, *Bancroft* implies that because it was targeted at franchisees of BBI, a known "resident" of California, it was therefore expressly aimed at California.[24]  But *Panavision* suggests a contrary result. Given the holding in *Panavision* that the use of a company's trademarks in domain names and web sites is not "expressly aimed" at the forum in which the company has its principal place of business, 141 F.3d at 1322, we question whether

---

[24] Not all circuits have adopted this approach.  For example, the Tenth Circuit requires that "the forum state itself must be the 'focal point of the tort'," an approach that it has described as "somewhat more restrictive" than *Bancroft*. *Dudnikov v. Chalk & Vermilion Fine Arts*, 514 F.3d 1063 (10th Cir. 2008) (citing *Far West Capital, Inc. v. Towne*, 46 F.3d 1071, 1080 (10th Cir. 1995)).

listings in New Jersey telephone directories could be characterized as actions expressly aimed at California.

Finally, BBI contends that the "brunt of the harm" to its reputation and profits is felt in California because California is its principal place of business.[25] BBI argues that just because BBI is a California corporation, a jurisdictionally sufficient amount of economic harm is felt in California. *See Harris Rutsky & Co. Ins. Servs. v. Bell & Clements, Ltd.*, 328 F.3d 1122, 1131 (9th Cir. 2003) (for "a California corporation whose principal place of business is in California, . . . the brunt of the harm [is] felt in California."). We cannot resolve this issue without more evidence. BBI's California complaint suggests that the Defendants' alleged infringement is causing economic harm to BBI as a whole. But White claimed that as of March 9, 2005, her company had not received a single call from anyone confused by the erroneous listing, which would suggest that little economic harm has been inflicted upon the New Jersey franchisees, let alone the national entity. Without further factfinding, it is impossible to decide which party is correct

---

[25] The Ninth Circuit has overruled the "brunt of the harm" requirement, replacing it with a "jurisdictionally sufficient amount of harm" requirement. *Yahoo! Inc. v. La Ligue Contre Le Racisme*, 433 F.3d 1199, 1207 (9th Cir. 2006) ("We take this opportunity to clarify our law and to state that the 'brunt' of the harm need not be suffered in the forum state. If a jurisdictionally sufficient amount of harm is suffered in the forum state, it does not matter that even more harm might have been suffered in another state.").

about the economic effects felt by BBI in California.

## C. Does The Cause of Action Arise Out of Forum-Related Activities?

The next prong of the three-part test for specific jurisdiction is whether the cause of action arises out of forum-related activities. Although this is a distinct requirement, in this case the analysis is identical to the "purposeful availment" analysis. BBI has not asserted that White or her company has *any* connection to California aside from those associated with the causes of action for breach of contract and trademark infringement. Thus, if the first prong is satisfied, then the second prong is satisfied as well.

## D. Fair Play and Substantial Justice, a.k.a. Reasonableness

If the District Court finds that the first two prongs are satisfied, it must consider whether "minimum requirements inherent in the concept of 'fair play and substantial justice' may defeat the reasonableness of jurisdiction even if the defendant has purposefully engaged in forum activities." *Burger King*, 471 U.S. at 477–78. Although there is a "strong presumption of reasonableness" if purposeful availment exists, *Dole Food*, 303 F.3d at 1117, courts must still consider reasonableness as a separate factor. This is a heavily fact-based inquiry. California has identified seven factors that affect reasonableness, none of which are determinative:

> (1) the extent of the defendants' purposeful interjection into the forum state's affairs; (2) the

46

burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendants' state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*Harris Rutsky*, 328 F.3d at 1132 (citing *Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1487–88 (9th Cir. 1993)). Most of these factors cannot be resolved without factfinding from the District Court. For example, the District Court might wish to consider the second factor in light of the statements throughout White's briefs that it is extremely burdensome for a small business in New Jersey with no California connections (aside from, perhaps, those created through its dealings with BBI) to litigate in California. To decide the fifth factor, the District Court should "focus on the location of the evidence and witnesses." *Harris Rutsky*, 328 F.3d at 1133. If most of the evidence and witnesses are located in New Jersey, where the alleged infringement occurred, this factor weighs against personal jurisdiction in California.

VI.

We will vacate the April 5, 2006 Order of the District Court for the District of New Jersey, including the assessment

47

of fees and costs. We remand this case so that the District Court may decide the question that the parties asked it to decide over two years ago: whether to set aside the California default judgment for lack of personal jurisdiction.

*Budget Blinds, Inc. v. White, et al.,* Nos. 06-2610 and 06-2733

Cowen, <u>Circuit Judge</u>, <u>concurring in part and dissenting in part</u>.


 This case arises out of the context of a 28 U.S.C. § 1963 registration proceeding, and more fundamentally, involves a collateral attack to a foreign default judgment. It is well-settled that the grounds for obtaining collateral relief are extremely limited. The majority, however, holds that registering courts have the power to vacate a foreign judgment rendered by their sister federal courts pursuant to Federal Rule of Civil Procedure 60(b)(6). In doing so, it becomes the first court in the nation to reach this conclusion. Because I think this holding potentially creates a circuit split where none existed before, and because I question whether such a broad ruling is necessary under the particular circumstances of this case, I respectfully dissent.


 Under the circumstances before us, one may *only* seek to collaterally vacate a default judgment obtained in another jurisdiction based on a challenge to the underlying validity of the judgment. <u>Sheet Metal Workers' Nat'l Pension Fund v. Elite Erectors, Inc.</u>, 212 F.3d 1031, 1034 (7th Cir. 2000) ("[a] party that simply refuses to appear may contend in a later case that the first tribunal lacked jurisdiction – though jurisdiction is the *only* issue thus preserved") (emphasis in original); <u>Yale v. Nat'l Indem. Co.</u>, 602 F.2d 642, 644 (4th Cir. 1979) ("only void judgments are subject to collateral attack, and [] a void judgment

49

is only one that is rendered by a court lacking jurisdiction over the default or over the subject matter"); see also Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 706 (1982) ("[a] defendant is always free to ignore the judicial proceedings, risk a default judgment, and then challenge that judgment on jurisdictional grounds in a collateral proceeding"). From this, it naturally follows that registering courts may entertain motions to vacate registered foreign judgments pursuant to Rule 60(b)(4), on the basis that the rendering court lacked jurisdiction. See 12 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE § 60.60[3][c] (3d ed. 1997); 30 Am. Jur. 2d *Executions and Enforcement of Judgments* § 813 ("the court in which the judgment is registered may determine whether the court which entered the judgment had jurisdiction over the subject matter and parties"). This is certainly the view that has been expressly embraced by nearly all[26] of our sister circuits to have squarely confronted the question, and I thus concur with the majority's opinion insofar as it adopts this relatively uncontroversial position as Third Circuit law.[27]

---

[26] As the majority points out, only the Seventh Circuit has held that registering courts lack such authority. See Sheet Metal Workers' Nat'l Pension Fund v. Elite Erectors, Inc., 212 F.3d 1031, 1034 (7th Cir. 2000); see also Pacific Reinsurance Mgmt. Corp. v. Fabe, 929 F.2d 1215, 1217 (7th Cir. 1991) ("[e]nforcement proceedings [pursuant to § 1963] do not allow collateral attacks on the judgment").

[27] We have never expressly spoken on this issue, but our prior decisions have certainly assumed the existence of such

50

However, the opinion does not stop there, but goes further to hold that registering courts may also consider Rule 60(b)(6) motions to vacate foreign judgments under certain "extraordinary circumstances." Here, I must part ways with my majority colleagues. While it is true that the precise contours of the registering court's authority to grant Rule 60(b) relief remain unsettled, I am nevertheless unaware of any court considering the question – before today – that has affirmatively declared such authority to exist for any Rule 60(b) subsection outside of the (b)(4) context.[28]  See 11 Charles A. Wright et al., FEDERAL

---

power on the part of enforcement courts. See In re Universal Display & Sign Co., 541 F.2d 142, 143-44 (3d Cir. 1976) (affirming registering court's denial of Rule 60(b)(4) relief where defendants litigated issue of personal jurisdiction in rendering court but lost); Somportex Ltd. v. Phila. Chewing Gum Corp., 453 F.2d 435, 444 (3d Cir. 1972) (affirming denial of relief from English default judgment sought to be enforced in Pennsylvania where defendants had opportunity to contest jurisdiction in English forum).

[28]  There is no question, of course, that regardless of whether a request for vacatur is labeled as one pursuant to Rule 60(b), courts possess the inherent power to grant relief if the grounds of the request otherwise satisfy the requirements of an independent action in equity. See Fed. R. Civ. P. 60(d) ("[Rule 60] does not limit the power of a court to: (1) entertain an independent action to relieve a party from a judgment, order, or proceeding; (2) grant relief under 28 U.S.C. § 1655 to a defendant not actually personally notified of the action; or (3)

51

set aside a judgment for fraud on the court."); 12 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE § 60.60[3][b] (3d ed. 1997); 30 Am. Jur. 2d *Executions and Enforcement of Judgments* § 813 (1994) ("[t]he registering court may[] grant relief from the judgment in an independent equitable action, particularly where some fraud or deception was practiced on the rendering court"). Indeed, numerous courts, when encountering Rule 60(b) vacatur requests based on allegations of fraud, mistake or excusable neglect, have construed them as independent equitable actions. E.g., Winfield Assocs., Inc. v. W.L. Stonecipher, 429 F.2d 1087, 1090 (10th Cir. 1970) (so construing Rule 60(b) motion, thus avoiding question of "whether Rule 60(b) is a proper means of attacking a judgment entered by a United States District Court sitting in another state"); Hadden v. Rumsey Products, Inc., 196 F.2d 92, 95 (2d Cir. 1952) (same). Thus, I would be satisfied if the holding here on the Rule 60(b)(6) "extraordinary circumstances" category of relief is expressly limited to *only* those narrow circumstances that would support an independent equitable action. But, the majority's view of a registering court's Rule 60(b)(6) authority is not so limited.

In any event, I note that no grounds to support an independent equitable action exist here, since defendant's affidavit makes clear that her default was intentional. App. vol. 2 at 56, ¶¶ 15-16 (attesting she did not appear in California action on advice of counsel); see 12 MOORE'S FEDERAL PRACTICE §§ 60.81-60.82 (independent equitable relief requires, *inter alia*, that no adequate remedy is available at law and that the judgment sought to be vacated is "manifestly

52

PRACTICE & PROCEDURE § 2787, at 36 (2d ed. 1995) ("the courts have not squarely decided to what extent, if at all, the court in which a judgment is registered can give relief from the judgment under Rule 60(b)"); Indian Head Nat'l Bank of Nashua v. Brunelle, 689 F.2d 245, 251 (1st Cir. 1982) (noting neither the parties nor the court itself could find a single case "where a court of registration was willing to entertain directly a Rule 60(b) motion other than one attacking a default judgment for lack of personal jurisdiction"). Indeed, the only court directly confronting the issue expressly held to the contrary: "[A] registration court errs in entertaining a Rule 60(b) motion that alleges neither a judgment void for lack of personal jurisdiction nor grounds that would support an independent equitable action." Brunelle, 689 F.2d at 251-52.

This is not surprising, in light of the general rule that notwithstanding the rule's silence on the topic, applications for Rule 60(b) relief must typically be made in the court rendering the judgment. See, e.g., 12 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE § 60.60[1] (3d ed. 1997) (although the rule itself does not expressly so provide, "it is clear that the drafters of the rule contemplated that the motion ... would *always* be brought 'in the court and in the action in which the judgment

---

unconscionable"); see also Somportex, 453 F.2d at 443 n.13 (suggesting collateral attacks to default judgments are allowed in "limited" instances where fraud or excusable neglect are involved).

was rendered'") (emphasis added); 11 FEDERAL PRACTICE & PROCEDURE § 2865, at 377 (Rule 60(b) motions generally made to rendering court). While this does not *per se* preclude one from challenging the underlying judgment upon registration, registering courts most often deny such challenges without prejudice, referring the parties to litigate the Rule 60(b) issue in the rendering court. See 11 FEDERAL PRACTICE & PROCEDURE § 2865, at 378 ("it is appropriate for the court in the district of registration to decline to pass on the motion for [Rule 60(b)] relief and to require the moving party to proceed in the court that gave judgment"); e.g., United States v. Fluor Corp., 436 F.2d 383, 384-85 (2d Cir. 1970) (affirming registration court's denial of Rule 60(b)(5) motion without prejudice). And rightly so. With these well-settled legal principles in mind, I think the First Circuit's holding in Brunelle best vindicates the significant comity interests implicated in the registration context while adequately preserving collateral avenues of relief for litigants.

Furthermore, even if one agrees with the substance of the majority's legal conclusion – one that is at odds with the Brunelle decision – that registering courts have the power to vacate foreign judgments under certain unspecified "extraordinary circumstances" pursuant to Rule 60(b)(6), the question remains whether this is the appropriate case in which to make such a proclamation. This is especially so when, notwithstanding its articulation of a new rule expanding the bases for which collateral relief may be granted in registration proceedings, the majority nevertheless acknowledges that no extraordinary circumstances exist in this case, in any event, so

54

as to warrant any such relief. It would seem then, that a satisfactory resolution could have been had here without advancing the Rule 60(b)(6) issue; we should have accordingly done simply this. For me, this case begins and ends with the District Court's vacatur of the default judgment insofar as its decision was based in any part on its perception of the merits of the underlying California action.[29] It is axiomatic that when a party purposefully fails to appear in an action on the basis of the belief that the foreign tribunal lacks personal jurisdiction, she waives the right to later contest the underlying merits of that action in a collateral proceeding. E.g., Elite Erectors, Inc., 212 F.3d at 1034; Hazen Research, Inc. v. Omega Minerals, Inc., 497 F.2d 151, 154 (5th Cir. 1974) (where "the defendant makes no appearance and the judgment goes by default, the defendant may defeat subsequent enforcement in another forum by demonstrating that the judgment issued from a court lacking personal jurisdiction ... [but] should the attack fail, the default

---

[29] In my view, the reason why Harad v. Aetna Casualty and Surety Company, 839 F.2d 979 (3d Cir. 1988) and Emcasco Insurance Company v. Sambrick, 834 F.2d 73 (3d Cir. 1987) do not apply turns not on that they were decided under Rule 60(b)(1) as opposed to Rule 60(b)(6), but simply because they both pertained to direct attacks on default judgments (where the motions for relief were made to the rendering courts themselves). Insofar as Harad and Emcasco require any consideration of the underlying merits of the action, they cannot dictate the governing standard for vacatur in the case where a party intentionally defaults and then seeks to vacate that judgment in the context of a registration proceeding.

55

judgment becomes no less final and determinative on the merits of the controversy than a decree entered after full trial"). Thus, when the District Court considered the merits of the California action below to opine that defendant "possesses an extremely meritorious defense" warranted vacatur, App. vol. 1 at 7, it missed the fundamental distinction between direct and collateral attacks. 18 MOORE'S FEDERAL PRACTICE § 130.35[1] ("registering court cannot look into the substance of the judgment to reexamine its validity"). As the Restatement cogently explains:

> [I]t is inappropriate to consider the merits of an attack on a judgment when that attack is made in the course of a subsequent action in which the judgment is relied on as a basis of claim or defense. To consider the merits of the attack in such a context is to contravene the general principle that relief from a judgment should be sought in the court that rendered the judgment.

RESTATEMENT (SECOND) OF JUDGMENTS § 80 cmt. a ¶ 2 (1982).

Accordingly, although I concur with the majority's ultimate disposition of the case, I respectfully dissent from its pronouncements on the general availability of Rule 60(b)(6) relief. Under the particular circumstances here, I would hold

that a registration court errs when it vacates a foreign judgment on grounds other than those of voidness or which would otherwise support an independent equitable action. The Full Faith and Credit Clause and the weighty interests of comity demand nothing less.